**Helen SIMMONS, Appellant,**

v.

**W. WHITAKER et al., Appellees.**

**No. 16746.**

United States Court of Appeals
Fifth Circuit.

Feb. 14, 1958.

Louise C. Rowen, Galveston, Tex., for appellant.

R. A. Richardson, Robert S. Coe, Kountze, Tex., for appellees.

Before BORAH, TUTTLE and CAMERON, Circuit Judges.

CAMERON, Circuit Judge.

This appeal is from a judgment of the District Court denying appellant's motion for a directed verdict and granting appellees' motion for a directed verdict made at the conclusion of appellant's evidence. Its action was based upon want of jurisdiction under the holding that the evidence offered did not develop a case under the Civil Rights Statute under which the action was brought.[1]

The action was brought against W. Whitaker, Sheriff of Hardin County, Texas, a deputy, and the surety on the sheriff's bond; against Hardin County, Texas, its county judge and its four county commissioners; against Hardin County Hospital and the five individuals comprising its board of managers; and against B. P. Dockery, a private citizen of said county. Damages were demanded against each of the appellees for unlawful arrest and detention of, and for the wrongful extraction of money from, appellant in payment of a hospital bill she claimed she did not owe. Jurisdiction was invoked under 28 U.S.C.A. § 1343[2] and 42 U.S.C.A. § 1983 "To redress the deprivation, under color of State law, statute, ordinance, regulation, custom or usage of a right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States."[3]

The District Court denied a motion to dismiss filed on behalf of all of the appellees challenging the jurisdiction of the Court, and proceeded to hear the evi-

---

1. The Judge's statement contained the following language: "* * * and that the action based upon Title 42, § 1983, the so-called Civil Rights Statute, under the record so far developed in this case, I cannot see how the plaintiff can recover or how this Court could submit any issue of fact to the jury under a Civil Rights case * * *."

2. "§ 1343. Civil rights
    "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
    "(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 47 of Title 8;
    "(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 47 of Title 8 which he had knowl-

edge were about to occur and power to prevent;
    "(3) To redress the deprivation, under color of any State law, statute, ordinance regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States. June 25, 1948, c. 646, 62 Stat. 932."

3. The complaint proceeds to enumerate the rights as including the right to be secured from unlawful arrest, the right not to be deprived of the equal protection of the laws as secured by the Fourteenth Amendment; the right to be free as regards one's person from threats, bodily harm and abuse as an incident of an illegal arrest or false imprisonment, and the right not to have one's property confiscated by officers and agencies of a State acting under color of State law without due process of law.

dence.[4] The evidence which appellant claims made out a jury case was as follows:

Appellant Helen Simmons was the daughter of Charlie Bogany, who was murdered June 8, 1954, while employed by Kirby Lumber Company of Honey Island, Hardin County, Texas. He had separated from appellant's mother when she was a small child and, at the time of his death, was married to a woman referred to in the record as Gustevia.[5] Appellant was beneficiary under a group life insurance policy Bogany carried through the lumber company and was entitled to receive the proceeds of the policy amounting to $3,000. Sheriff Whitaker had learned of the policy and that appellant was beneficiary, in his investigation of Bogany's murder. Bogany had been carried to the Hardin County Hospital and Sheriff Whitaker had stood for his bill and, for that reason, he had requested Dockery, employee of Kirby, to notify him when the check came. Grice, the undertaker, had made a similar request and Dockery notified both when the check arrived. Appellant learned of the arrival of the check through undertaker Grice.

Appellant, resident of another county, was brought to Honey Island by Reverend Benford, and the two had driven by Grice's home about nine miles distant, and had picked him up and the three called at the Kirby office for the check. They were informed that the check was not then ready for delivery and were told to wait a while; and they waited on the porch of the commissary and in Rev. Benford's car. In the interim Dockery telephoned Sheriff Whitaker, who arrived in a short time with his deputy, one or both of whom bore arms. He had with him upon arrival the hospital bill amounting to about $115 due by Bogany, and also a bill for approximately $1,164.55 due for hospital services to Claudia Ford, which bill the testimony tended to show had been "stood for" by Bogany.[6] This bill had been handed to the sheriff by the jailer who probably had received it from the hospital superintendent.

Appellant and Whitaker had a conversation and appellant advised him that she did not mind paying her father's bill, but that she did not think she ought to pay the Claudia Ford bill. The sheriff demanded payment of both, telling her that "he will hold the check, if I didn't pay the bill, and he will hold me too if I didn't pay that bill." Reverend Benford then talked with the sheriff, arguing that appellant should not be made to pay the Ford bill. The sheriff became very angry, using abusive language and telling Rev. Benford that he would seize the check and hold it if the bill was not paid. After extended conversations, Rev. Benford advised appellant to go ahead and pay the two bills. He did this because both he and appellant were frightened.

Kirby required an affidavit from appellant that she was the beneficiary in the policy, and she, Rev. Benford, Grice, Whitaker and the deputy went over to the post office to have the instrument executed before a notary. This done, appellant, Rev. Benford and Grice got into one car and started to the bank, and the sheriff and his deputy followed behind them in another car. Appellant and her friends entered the bank just in advance of the sheriff and the deputy. The sheriff

---

4. Witnesses produced on behalf of appellant were appellant, herself, and Reverend D. N. Benford, her pastor, and Grice, who accompanied her throughout the proceedings of which she complains; Dockery, employee of Kirby Lumber Company; Whitaker, the sheriff; Miss Doris Drake, hospital employee; Judge Fletcher Richardson, County Judge; and Messrs. Robert S. Coe and George Dickson, members of the hospital board.

5. Appellant refers to her in her brief as a woman with whom he was merely living, but this is not justified by the evidence. Dockery referred to her as Bogany's wife, plaintiff referred to her as her stepmother, and Reverend Benford referred to her as being married to Bogany, and no countervailing evidence of the relationship was adduced.

6. The testimony is not clear on the subject, but apparently Claudia Ford was Bogany's stepdaughter.

identified appellant and the banker reluctantly agreed to cash the check. The money was counted out in the presence of and under the chaperonage of all five, and was handed over to appellant, who placed it in her purse.

The sheriff then asked appellant's group if they knew the way to the hospital and were advised by Rev. Benford that they did not. He told them to follow him, and he and his deputy led the way, the other three following in Benford's car. Upon arrival at the hospital, all five of them went into the office and both bills were paid by appellant and receipts issued. The sheriff remained in the office during a part, and possibly during all, of these proceedings.

Appellant and her two friends left and drove to the home of Grice some miles away where they had lunch. All of this took place on July 28, 1954. In August, a trial was held and appellant was a witness, remaining in and around the courthouse at Kountze three days, and the murderer of Bogany was convicted. She did not approach the county judge or the sheriff or anyone else concerning the transaction which had taken place on July 28th, and the matter was not mentioned to anyone connected with any of the defendants until the early part of December. At that time appellant's attorney mentioned it to the county judge and told him what she contended to be the circumstances of the payment. The county judge advised her that a claim should be filed with the Commissioner's Court and it would be passed upon as any other claim. On December 6th, the attorney wrote a letter [7] apparently to Mrs. Hazel Matthews Hartwell, a nurse who had been temporary administrator of the hospital at the time the money was paid (she was not sued).

No claim was ever filed with the Commissioner's Court, and none with the hospital except as was contained in the quotations from the letter, fn. 7 supra. None of the officials of the hospital or the county who were put on the stand had ever heard of the claim until this civil action was filed nearly two years after the occurrence, except the county judge, and none had participated in or had knowledge of the acts of the sheriff in making the collection.[8]

Under Chapter 3, Title 33, Articles 1572 et seq., 3 Vernon's Civil Statutes of the State of Texas, the counties of Texas are established as bodies "corporate and politic," and it is provided that no county shall be sued unless the claim has first been presented to the Commissioner's Court and payment has been neglected or refused. By the same Code, Chapter 5, Articles 4478 et seq., the Commissioner's Court is empowered to establish a

---

7. The letter is not in the record, but these two excerpts were read from it.

"It is our position that any sums paid by the hospital to any other person, out of the monies paid to them by the sheriff in the above transaction, is a question between the hospital and the payee, and it is to the hospital that she will look for full payment. * * * I therefore request that the sum of $1164.55 be refunded by the hospital to Helen Simmons."

8. The county judge testified that, in his opinion, the hospital had no right to refund the money and that the only way the matter could be considered was for a claim to be filed with the Commissioner's Court. He had talked it over informally with some members of the hospital board and possibly members of the court, but the matter had never been presented for formal discussion. When pressed by counsel, he testified that it was his personal opinion that the money was not recoverable and stated that he had reached the conclusion that it ought to be treated as a gratuity.

The testimony of appellant and Benford was sharply contradicted by that of Sheriff Whitaker, and also by that of Dockery, and the Judge had the benefit of Whitaker's version which was that appellant had voluntarily paid the bill. His opinion thus expressed was manifestly based upon what Sheriff Whitaker had told him. He had never talked with appellant and had never been called upon to hear evidence and decide the claim as contemplated by Texas law.

Under the Texas statutes dealing with county hospitals, it was the policy to collect from all who benefited from their services. See Title 71, art. 4487 et seq., Vernon's Texas Civil Statutes.

county hospital, to levy taxes for its maintenance, to appoint a board of managers subject to its will, and to pay all bills and accounts approved by the board of managers and transmitted to it. Under these statutes, supplemented by the testimony, the hospital was not the custodian of any monies, and it had no right to disburse any monies or pay any bills.

Appellant makes an extended argument that she was entitled to maintain her action under the Civil Rights Statute quoted above, but she produces no authority to sustain it.[9] It seems logical to distinguish these federal decisions before considering the other side of the argument.

Picking involved a complaint more than 150 pages long, and the court below had dismissed it largely because in its opinion it did not conform to Fed.Rules Civ.Proc. Rule 8(e), 28 U.S.C.A. requiring that the averments of a pleading must be simple and concise and direct. But the Court of Appeals proceeded to fashion, from the disjointed averments, a pleading which in its opinion set forth three causes of action. Jurisdiction of the second and third, charging false imprisonment, was sustained because of diversity of citizenship between plaintiffs and all of the defendants. The first cause of action alone was thought to be sustainable under the Fourteenth Amendment as sought to be implemented by the Civil Rights laws. Without going into this phase of the decision in any detail, it is sufficient to point out that the Court of Appeals states [151 F.2d at page 247], "The plaintiffs do not allege a denial of

equal protection of the laws;" and quotes from Supreme Court cases language which demonstrates the non-applicability of that case to this one.

For example, the Picking decision states, 151 F.2d at page 248: "In United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368, in which Section 20 of the Criminal Code * * * was under discussion Mr. Justice Stone stated, 'This use of power, *possessed by virtue of state law* and made possible only because the wrongdoer is clothed with authority of state law, is action taken "under color of" state law.'" Again, the decision quotes from the Supreme Court decision in Screws v. United States, 323 [325] U.S. * * *,[10] this language: *"We are not dealing here with a case where an officer not authorized to act nevertheless takes action. Here the state officers were authorized to make an arrest and to take such steps as were necessary as to make the arrest effective."* [Emphasis added in each instance.][11] The court reached the conclusion that the averments of the complaint there under consideration charged violation of the Pennsylvania law, and the decision was based on the assumption that the charges of the complaint were true.

Romero involved a series of suits brought on behalf of Mexican, white and Negro children to correct discriminatory practices based upon race alone. All parties agreed in the lower court[12] that the actions complained of violated the Constitutions both of the United States and the State of California, and the only

9. Her alphabetical list of authorities contains nineteen references to Texas statutes and decisions, two references to American Jurisprudence (dealing with conspiracies under the commerce clause of the Constitution), and five decisions of federal courts, to-wit, Bracken v. Cato, 5 Cir., 54 F.2d 457; Picking v. Pennsylvania R. Co., 3 Cir., 1945, 151 F.2d 240; United States v. L. D. Caulk Co., D.C. U.S.D.C.Del., 1954, 126 F.Supp. 693; and Romero v. Weakley, 9 Cir., 1955, 226 F.2d 399.

Bracken treats only of the liability of a sheriff for the act of his deputy, and Caulk only of proof of conspiracy under anti-trust laws by circumstantial evidence, and no further discussion of these two authorities is indicated.

10. The correct reference is Screws v. United States, 325 U.S. 91, 111, 65 S.Ct. 1031, 1040, 89 L.Ed. 1495.

11. The sentence following this quotation reads: "They acted without authority only in the sense that they used excessive force in making the arrest effective * * *"

12. Romero v. Weakley, D.C., and companion cases, 131 F.Supp. 818.

question passed on by the lower court was whether in the exercise of its equitable discretion the litigants should be relegated to the state courts for relief. The trial court did not enter an order, but held the cases on its docket to await state action.[13] The Court of Appeals reversed,[14] following Supreme Court decisions announcing that where a party properly invokes federal jurisdiction, the court cannot deny him his choice. In that case, as stated, all parties agreed that state action was involved.

■■■ It is clear, therefore, that none of appellant's authorities come close to dealing with the fundamental weakness of her suit—that what she complains of does not involve state action at all. The answer to appellant's complaint is that if all of the appellees did what she alleged they had done, no state action—a *sine qua non* of a suit under this statute [15] would have been involved. This is so because the sheriff had no authority to collect any debt due to the hospital, or to take any steps to that end, or to arrest or detain any person for failing or refusing to pay a debt whether claimed by the state or by a private person.[16] Before she could maintain a federal action against the sheriff and the body politic which employed him, she would have to show that in making the alleged threats and arrest, he was performing a function which he was commissioned to perform by the State of Texas.

These principles were recently applied by the Supreme Court in a case claiming rights under the same Act *inter alia*.[17] Snowden sued demanding damages against Hughes, et al., members of the State Primary Canvassing Board of Illinois who, he claimed, had discriminated against him in contravention of the provisions of the Fourteenth Amendment by refusing to certify him as a party nominee in a state election. His complaint was dismissed by the District Court, and its judgment was affirmed by the Court of Appeals for the Seventh Circuit,[18] and both actions were affirmed by the Supreme Court. After quoting *inter alia* the section of the Civil Rights laws now before us and the provisions of the Fourteenth Amendment relied on there and here, the Supreme Court used this language:

"The protection extended to citizens of the United States by the privileges and immunities clause includes those rights and privileges

---

13. Id., page 832.

14. 226 F.2d 399.

15. Collins v. Hardyman, 1951, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253.

16. Article 5, § 23 of the Texas Constitution and the "Interpretative Commentary" appended to it (2 Vernon's Constitution of the State of Texas, pp. 314–315) vests the sheriff with powers traditionally belonging to that office (cf. 47 Am.Jur., pp. 839 et seq.), which the last paragraph of the Commentary thus epitomizes: "The main duties of the sheriff are to act as a conservator of the peace and the executive officer of the county and district courts; serve writs and processes of the courts; and supervise the jail and all prisoners. In counties of less than ten thousand population he is also *ex officio* tax assessor and collector."

Title 5, Articles 212–217 of 1 Vernon's Texas Code of Criminal Procedure, enumerates the circumstances under which arrests may be made without a warrant, consisting of the conventional right to arrest where a felony is committed in the officer's presence and the like.

Title 120, Articles 6865–6877, 19 Vernon's Texas Civil Statutes treats generally of the duties and liabilities of sheriffs; and Chapter Seven, Articles 7181–7244, 20 Vernon's Civil Statutes, covers assessment and collection of taxes.

We are cited to no Texas statute or case investing the sheriff with authority to perform any of the acts charged in the complaint or disclosed by the testimony, and a careful examination on our part has disclosed none. It is manifest, therefore, that the statement of the sheriff made on the witness stand without objection, that he was acting purely as a private citizen in his dealings with appellants, accords with Texas law on the subject.

17. Snowden v. Hughes, 1943, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497.

18. 7 Cir., 132 F.2d 476.

which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law. [321 U.S. at pages 6–7, 64 S.Ct. at page 400] * * *

"There is no allegation of any facts tending to show that in refusing to certify petitioner as a nominee, the Board was making any intentional or purposeful discrimination between persons or classes. On the argument before us petitioner disclaimed any contention that class or racial discrimination is involved.[19] The insistence is rather that the Board, merely by failing to certify petitioner as a duly elected nominee, has denied to him a right conferred by state law and has thereby denied to him the equal protection of the laws secured by the Fourteenth Amendment. [321 U.S. at pages 7–8, 64 S.Ct. at page 400]

"But not every denial of a right conferred by state law involves a denial of the equal protection of the laws, even though the denial of the right to one person may operate to confer it on another. * * *

"The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless there is shown to be present in it an element of intentional or purposeful discrimination. * * * But a discriminatory purpose is not presumed, * * there must be a showing of 'clear and intentional discrimination.' * * *[20]

"The lack of any allegations in the complaint here, tending to show a purposeful discrimination between persons or classes of persons is not supplied by the opprobrious epithets 'willful' and 'malicious' * * * or by characterizing that failure as an unequal, unjust, and oppressive administration of the laws of Illinois. [321 U.S. at page 10, 64 S.Ct. at page 402] * * *

" * * * It was not intended by the Fourteenth Amendment and the Civil Rights Acts that all matters formerly within the exclusive cognizance of the states should become matters of national concern.

"A construction of the equal protection clause which would find a violation of federal right in every departure by state officers from state law is not to be favored * * *"

The idea was developed further in the concurring opinion of Mr. Justice Frankfurter:

[321 U.S. at page 16, 64 S.Ct. at page 405] "But to constitute such unjust discrimination the action must be that of the state. Since the state, for present purposes, can only act through functionaries, the question naturally arises what functionaries, acting under what circumstances, are to be deemed the state for purposes of bringing suit in the

19. In the case before us appellant does advert briefly to such a contention through assuring constantly that she claims no rights under 42 U.S.C.A. § 1985 (where the emphasis is centered on *equal protection of the laws).* But her complaint did not mention her race and did not contain any allegation that she was discriminated against because she was a Negro. In fact, neither the complaint nor the testimony reveals the race or nationality of appellant. It is inferable from the fact that the proof showed that the two friends who accompanied her were Negroes that plaintiff, too, was a member of that race. But the record contains no evidence at all that the acts complained of were the result of such a fact or that she was discriminated against as a member of any class.

20. And see Fay v. People of State of New York, 1947, 332 U.S. 261, 285, 67 S.Ct. 1613, 91 L.Ed. 2043, which reiterates that the burden of proving such alleged discrimination is on him who charges it.

federal courts on the basis of illegal state action. \* \* \* It is not to be resolved by abstract considerations such as the fact that every official who purports to wield power conferred by a state is *pro tanto* the state. Otherwise every illegal discrimination by a policeman on the beat would be a state action for purpose of suit in a federal court. \* \* Such a problem of federal judicial control must be placed in the historic context of the relationship of the federal courts to the states, with due regard for the natural sensitiveness of the states and for the appropriate responsibility of state courts to correct the action of lower state courts and state officials. \* \* \* "
[Emphasis supplied.]

In dealing with the criminal counterpart of the statute before us, 18 U.S.C.A. § 242, the Supreme Court, in Screws v. United States, 1945, 325 U.S. 91, 108–109, 65 S.Ct. 1031, 1039, 89 L.Ed. 1495, used this language: "The fact that a prisoner is assaulted, injured, or even murdered by state officials does not necessarily mean that he is deprived of any right protected or secured by the Constitution or laws of the United States \* \* \* The Fourteenth Amendment did not alter the basic relations between the States and the national government \* \* \* As stated in United States v. Cruikshank, 92 U.S. 542, 553–554, 23 L.Ed. 588, 'It is no more the duty or within the power of the United States to punish for a conspiracy to falsely imprison or murder within a State, than it would be to punish for false imprisonment or murder itself.' " The Supreme Court reversed the conviction of the state officers because the trial court had charged the jury that they

could be found guilty of a federal offense, "if they applied more force than was necessary to make the arrest effectual or to protect themselves from the prisoner's alleged assault." It held that it was not sufficient that the officers had a "generally bad purpose," but it must be shown that they had the purpose to deprive the prisoner of a right guaranteed by the federal Constitution.

And it was necessary for the appellant to make the same showing here and she has failed to do so. The evidence does not disclose any fact or circumstance justifying a finding that any of the appellees did any act with the intent of violating appellant's constitutional rights. Even, therefore, if what the sheriff and the other appellees did were state action, appellant's case would fail for this additional reason.

■ This Court has adhered to the same principles in a number of cases,[21] but it is not necessary to discuss them. We are of the opinion that the evidence adduced by appellant failed to make out a case of which the District Court had jurisdiction, and that it was proper for that Court to take the case away from the jury. But we think that the order entered by it went too far[22] and that appellant should be left free, if she should desire, to pursue whatever remedies, administrative or judicial, the laws and courts of Texas may afford her. The judgment of the court below is therefore modified so as to dismiss the complaint without prejudice because of want of federal jurisdiction, and, as so modified, the judgment is

Affirmed.

TUTTLE, Circuit Judge.

I concur in the result.

---

21. Charlton v. City of Hialeah, 1951, 188 F.2d 421; Hewitt v. City of Jacksonville, 1951, 188 F.2d 423; Whittington v. Johnston, 1953, 201 F.2d 810; Yglesias v. Gulf Stream Park Racing Association, 1953, 201 F.2d 817; Dinwiddie v. Brown and companion cases, 1956, 230 F.2d 465; and McGuire v. Todd, 5 Cir., 1952, 198 F.2d 60, certiorari denied 344

U.S. 835, 73 S.Ct. 44, 97 L.Ed. 649, and cf. Roark v. West, 5 Cir., 1958, 251 F.2d 956.

22. " \* \* \* It is accordingly ordered, adjudged and decreed that the plaintiff take nothing as against the defendants, and that all of the defendants go hence without day \* \* \*."