Albert J. TULLIER, Sr., Appellant,

v.

Frank GIORDANO, Registrar of Voters
for the Parish of Plaquemines,
Appellee.

No. 17450.

United States Court of Appeals
Fifth Circuit.

March 24, 1959.

**2**

Jacob H. Morrison, New Orleans, La., for appellant.

Sidney W. Provensal, Jr., New Orleans, La., for appellee.

Before RIVES, CAMERON and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

Appellant sued appellee for injunctive relief and money damages, claiming that he had a right to register as a voter in the Parish of Plaquemines, Louisiana, and that such right had been denied to him by the appellee. The first question is whether the district court had jurisdiction.

The complaint, after averring that the defendant is the Registrar of Voters for Plaquemines Parish and detailing the plaintiff's qualifications as a voter in that Parish, alleges that the defendant denied registration to the plaintiff and to a considerable number of other named persons upon the applicant's failure or refusal to meet a requirement by the defendant that the applicant interpret in writing certain selected clauses or sections of the Constitution of Louisiana and of the Constitution of the United States. The complaint alleges that the defendant registrar "has never hesitated to register without any constitutional interpretations or readings those voters of his own political faction, party or alignment"; that the defendant is "systematically discriminating against all voters hostile to him or nonsympathetic with his political faction"; that a deputy registrar informed plaintiff "that he would be permitted to register but must first divulge his political preferences, if he aligned himself with the political faction of defendant, he would

be permitted to register. This complainant refused to do"; and further "that the above described practices and actions of defendant in discriminating against him while permitting others to register who were unable to pass any constitutional test has had the effect of depriving him of his right to vote not only for candidates in primary elections but also in federal elections, i. e., for Congress, United States Senator and President."

The district court concluded: "This Court has jurisdiction over the parties and the subject matter. U. S. Constitution, Amend. 14; Title 42, U.S.C. [§] 1983; United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031 [85 L.Ed. 1368]; U.S.Const. Art. 1, Sec. 2." We agree.

The Congress has granted to the district courts original jurisdiction of a civil action to redress the deprivation under color of any State law of any rights, privileges or immunities secured by the Constitution of the United States.[1]

Under our federal system the qualification of voters is left to the several states subject to some limitations imposed by the United States Constitution. As originally adopted, the Constitution contained few provisions on the subject of voting rights. Article I, Section 2, Clause 1 provided:

"The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

Section 4, Clause 1 of that Article provided:

"The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."

---

1. 28 U.S.C.A. § 1343; 42 U.S.C.A. § 1983.

Touching the elective franchise possibly in an indirect or remote way was Article II, Section 1, Clause 3, later amended by the Twelfth Amendment, prescribing the procedure for electing the President and Vice President.

Amendments since the War Between the States have considerably extended the scope of federal power to regulate the elective franchise. The Fifteenth Amendment has no application to this case, since the complaint shows that the plaintiff is a white man. Nor is the Nineteenth, or Woman Suffrage, Amendment involved. The Seventeenth Amendment provides for the direct election of Senators by electors in each State having the qualifications requisite for electors of the most numerous branch of the State legislatures.

■ That the complaint does state a case within the jurisdiction of the district court to redress the deprivation of rights, privileges or immunities secured by the Constitution of the United States does not require an elaborate discussion of the rights of suffrage and of the extent to which those rights are secured by the Constitution of the United States. Brief quotations from two leading cases will suffice to demonstrate that the complaint states a case within the jurisdiction of the district court.

"* * * While, in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, see, Minor v. Happersett, 21 Wall. 162, 170, 22 L.Ed. 627; United States v. Reese, 92 U.S. 214, 217, 218, 23 L.Ed. 563; McPherson v. Blacker, 146 U.S. 1, 38–39, 13 S.Ct. 3, 11, 12, 36 L.Ed. 869; Breedlove v. Suttles, 302 U.S. 277, 283, 58 S.Ct. 205, 207, 82 L.Ed. 252, this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, to the extent that Congress has not restricted state action by the exercise of its powers to regulate elections under § 4 and its more general power under Article I, § 8, clause 18 of the Constitution 'to make all laws which shall be necessary and proper for carrying into execution the foregoing Powers.' See Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717; Ex parte Yarbrough, supra, 110 U.S. [651], 663, 664, 4 S.Ct. [152] 158, 28 L.Ed. 274; Swafford v. Templeton, 185 U.S. 487, 22 S.Ct. 783, 46 L.Ed. 1005; Wiley v. Sinkler, 179 U.S. 58, 64, 21 S.Ct. 17, 20, 45 L.Ed. 84.

"Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections. This Court has consistently held that this is a right secured by the Constitution. Ex parte Yarbrough, supra; Wiley v. Sinkler, supra; Swafford v. Templeton, supra; United States v. Mosley, supra [238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355]; see Ex parte Siebold, supra; In re Coy, 127 U.S. 731, 8 S.Ct. 1263, 32 L.Ed. 274; Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429. And since the constitutional command is without restriction or limitation, the right unlike those guaranteed by the Fourteenth and Fifteenth Amendments, is secured against the action of individuals as well as of states. Ex parte Yarbrough, supra; Logan v. United States, supra." United States v. Classic, 1941, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037, 85 L.Ed. 1368.

"Where discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights. McPherson v. Blacker, 146 U.S. 1, 23, 24, 13 S.Ct. 3, 6, 36 L.Ed. 869; Nixon v. Herndon, 273 U.S. 536, 538, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984; See Pope v. Williams, supra, 193 U.S. [621],

634, 24 S.Ct. [573, 576, 48 L.Ed. 817]. But the necessity of a showing of purposeful discrimination is no less in a case involving political rights than in any other." Snowden v. Hughes, 1944, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497.

On the merits, the district court found that, "Plaintiff failed to make out his case." Again, we agree.

According to the plaintiff's own testimony, the defendant had told him that, if he would come back he would, without any commitment, not have to answer the questions to which he objected. That was before any election involving candidates for Congress, United States Senator, or Presidential Elector.

Further, the plaintiff testified that the only reason he was given a test on the Constitution was because of the fact that he had a place of business across the street from a similar business operated by the defendant's brother.

> "Until I told him that I knew his brother and that I had a business across the street from him; everything went on all right. Until I told him that I knew his brother and that I had a business across the street from him. That's when he brought out this other card. He said, 'You have questions to answer.'
>
> \* \* \* \* \* \*
>
> " \* \* \* He was very nice about it, until he found out that—like I stated before—that I had a business across the street from his brother and that's the only thing that I could say that's the cause of the whole thing."

Such a denial of registration, if admitted, may be a violation of state law, but it does not constitute such "purposeful discrimination between persons or classes of persons" as would amount to a denial of the equal protection of the

laws within the meaning of the Fourteenth Amendment.[2] The judgment is therefore

Affirmed.

CAMERON, Circuit Judge (dissenting).

I agree with the opinion of the majority that the appellant failed to make out a case on the merits. But I disagree with the conclusion it announces that the District Court of the United States had jurisdiction to try the case. Since my difference with the majority relates to a vital question touching the relationship of the states with the federal government in an important field, I am impelled to state briefly the reasons for my dissent.

I.

The majority opinion pays lip service to the principle that "Under our federal system the qualification of voters is left to the several states subject to some limitations imposed by the United States Constitution." But it intimates that the jurisdiction of the states over the elective franchise does not amount to much because of amendments to the Constitution since the War Between the States.

I think the correct rule on the subject is stated in Darby v. Daniel, D.C.S.D. Miss.1958, 168 F.Supp. 170, 176:

> "Any consideration of the constitutionality of the challenged portions of this amendment begins with the fundamental fact that, under our constitutional system, the qualification of voters is a matter committed exclusively to the States. The Supreme Court has spoken on the subject in language as clear as it is decisive. Witness, for example, what it said in Pope v. Williams, 1904, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817:
>
> " 'The privilege to vote in any state is not given by the Federal

---

2. Snowden v. Hughes, 1944, 321 U.S. 1, 10 and 11, 64 S.Ct. 397, 88 L.Ed. 497; See also, Backus v. Fort Street Union Depot Company, 1898, 169 U.S. 557, 569, et seq., 18 S.Ct. 445, 42 L.Ed. 853; McCloskey v. Tobin, 1920, 252 U.S. 107, 108, 40 S.Ct. 306, 64 L.Ed. 481.

Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627. It may not be refused on account of race, color, or previous condition of servitude, but it does not follow from mere citizenship of the United States. In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper * * *.' "

Following this quotation (168 F.Supp. 177–181) is a full discussion of the rights of the states to control election machinery, together with citation of supporting Supreme Court cases.

## II.

The case of Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, is in my opinion, direct support for the position that the court below had no jurisdiction to try this case. The brief quotation in the majority opinion from that case is not sufficient to bring the holding of the Supreme Court into proper focus. The Snowden case was discussed by us at some length in the case of Simmons v. Whitaker, 1958, 252 F.2d 224; and the more extended quotation from it at pages 229–231, as well as in the dissenting opinion in Reddix v. Lucky, 5 Cir., 1958, 252 F.2d 930, 939–940, demonstrate, in my opinion, that the holding of the Supreme Court in Snowden is directly opposite to that attributed to it by the majority opinion.

## III.

The Act under which appellant invoked federal jurisdiction was one of a series concerning which the Supreme Court said in Collins v. Hardyman, 1950, 341 U.S. 651, 656, 71 S.Ct. 937, 939, 95 L.Ed. 1253:

"The Act was among the last of the reconstruction legislation to be based on the 'conquered province' theory which prevailed in Congress for a period following the Civil War."

The Supreme Court has held uniformly that this series of statutes, to be constitutional, must be given a narrow and limited application. The reason for this was thus set forth in the concurring opinion of Mr. Justice Stone in Hague v. C. I. O., 1939, 307 U.S. 496, 521 et seq., 59 S.Ct. 954, 966, 83 L.Ed. 1423, where he discussed the Fourteenth Amendment which they were designed to implement:

"The reason for this narrow construction of the clause and the consistently exhibited reluctance of this Court to enlarge its scope has been well understood since the decision of the Slaughter-House Cases [16 Wall. 36, 21 L.Ed. 394]. If its restraint upon state action were to be extended more than is needful to protect relationships between the citizen and the national government, and if it were to be deemed to extend to those fundamental rights of person and property attached to citizenship by the common law and enactments of the states when the Amendment was adopted, * * * it would enlarge Congressional and judicial control of state action and multiply restrictions upon it whose nature, though difficult to anticipate with precision would be of sufficient gravity to cause serious apprehension for the rightful independence of local government."

The whole thesis of narrow construction of the so-called Civil Rights Statutes—to which this Court is so definitely committed—was further developed in the dissenting opinion in Sharp v. Lucky, 5 Cir., 1958, 252 F.2d 910, 915 et seq.

## IV.

The case before use involves nothing but a local political brawl. To extend federal jurisdiction to such would spread so thin the energies of the handful of men constituting the Federal Judiciary that there would be no time left for the performance of their legitimate duties.

**6**

It would, moreover, lend substance to the widespread feeling that "The Cult of the Cloth" is engaged, by some sort of boot-strap-lifting technique, in an effort to turn over to federal functionaries the most intimate prerogatives of local self-government in derogation of universally accepted tenets of State-Federal relationships. Such a concept, wherever it is given effect, cannot, in my opinion, fail to bring the whole federal judicial process into disrepute. So feeling, I cannot but record my unequivocal rejection of it.