# VISA Fraud Investigation

Although facially a violation of applicable statutes, the State Department may issue a visa to an ineligible alien in order to facilitate an undercover operation conducted by the Immigration and Naturalization Service. Undercover operations often involve facially illegal conduct by government officers, but courts have not held such conduct to be illegal if it is necessary to secure a permissible law enforcement objective.

November 20, 1984

MEMORANDUM OPINION FOR THE GENERAL COUNSEL,
IMMIGRATION AND NATURALIZATION SERVICE

This responds to your request for our opinion on whether the Department of State may issue a visa to an ineligible alien in order to facilitate an undercover operation being conducted by the Immigration and Naturalization Service (INS). We believe that the Department of State may issue the visa.

## I. Background

INS is presently conducting an undercover operation to investigate individuals suspected of paying American citizens to enter into sham marriages with aliens.[1] INS has focused on a group suspected of smuggling into the United States large numbers of aliens who then enter into sham marriages. In order to infiltrate the group, INS has persuaded an American citizen who has admitted entering into a sham marriage to cooperate with the INS. The individual has filed a visa petition on behalf of his putative wife. The petition has been approved by the INS and forwarded to the American consul in Canada for processing. As explained by INS officials, the approval of the petition and issuance of the visa will enable the individual to win the confidence of the suspects:

> The objective is to have both the alien and the United States citizen spouse, a cooperating private individual (CPI), travel to [Canada] so that in addition to obtaining the visa, the CPI would

---

[1] Once married to the American citizen, the alien is eligible to receive a resident visa.

284

meet with additional conspirators and gain their confidence by letting them know that the visa had been successfully issued.

Once the visa was issued, it would be taken from the alien at the port of entry and the alien would be issued a Form I-94 indicating entry and the pending issuance of a Form I-551, as is normal procedure. The visa would then be retained as evidence by the United States Attorney's Office, and be returned eventually to the Department of State.

Memorandum for Maurice C. Inman, Jr., General Counsel, INS, from John F. Shaw, Assistant Commissioner for Investigations, INS (Oct. 23, 1984). When the individual and his wife return to the United States, it is hoped that the suspects, having been assured of the individual's reliability, will ask him to recruit others, thereby allowing infiltration by INS and eventual prosecution.

The Department of State has declined to issue the visa necessary for the operation to proceed, and has raised the question whether issuance of the necessary visa would violate 8 U.S.C. § 120I(g)(3), which provides that "[n]o visa . . . shall be issued to an alien if . . . the consular officer knows or has reason to believe that such alien is ineligible." Because the American consul knows the alien in this case has entered into a sham marriage, the Department of State will not issue the visa unless this Office opines to the contrary.

## II. Analysis

Government law enforcement efforts frequently require the literal violation of facially applicable statutes. One obvious example would involve police officers who must exceed the applicable speed limit in order to catch a speeder or an escaping criminal. In order to explain why such law enforcement activity does not violate the law, the courts have construed prohibitory laws as inapplicable when a public official is engaged in the performance of a necessary public duty. In reaching this conclusion, some courts have focused on legislative intent, reasoning that these statutes do not apply "where public officers are impliedly excluded from language embracing all persons [because] a reading which would include such officers would work obvious absurdity as, for example, the application of a speed law to a policeman pursuing a criminal or the driver of a fire engine responding to an alarm." *Nardone* v. *United States*, 302 U.S. 379, 384 (1937) (footnote omitted). Other courts have simply referred to the basic principle that action by public officials that would otherwise violate a statutory prohibition is justifiable if it is *necessary* to achieve a legitimate government objective and is done in a *reasonable* fashion.[2] Thus, the courts have held

---

[2] This principle appears to be derived from the common law defense of necessity. W. LaFave & A. Scott, *Handbook on Criminal Law* 381 n.1 (1972). The federal case law is not well-developed, "probably because common sense usually prevents a prosecution in such a case." K. Sears & H. Weihofen, *May's Law of Crimes* § 60, at 68 (4th ed. 1938).

inapplicable not only speeding laws,[3] but virtually the entire spectrum of civil[4] and criminal law.[5]

The case law is nevertheless relatively sparse since few states or cities prosecute their law enforcement officers for their activities and, therefore, the defense of official conduct seldom needs to be raised.[6] However, defendants challenging their convictions have often argued that the government's activity violated a law and that the defendant's conviction is therefore invalid. The courts have almost uniformly rejected these challenges, noting that it is often necessary for law enforcement officers to engage in otherwise illegal conduct in order to catch criminals. This is especially true in undercover operations, as the Supreme Court has recognized. For example, in *United States* v. *Russell*, 411 U.S. 423, 430 (1973), a defendant challenged his conviction for manufacturing PCP on the grounds that the government's undercover involvement, including contributing one of the major ingredients, was so outrageous that it violated the Due Process Clause. The Supreme Court rejected the argument, stating that the undercover agent did not "violate any federal statute or rule or commit any crime, in infiltrating the . . . drug enterprise." *Id.* at 430.

> In order to obtain convictions for illegally manufacturing drugs, . . . law enforcement personnel have turned to one of the only practical means of detection: the infiltration of drug rings and a *limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation*; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them.

*Id.* at 433 (emphasis added). Thus, the Supreme Court recognized that undercover operations often involve technically illegal conduct by government officers and approved that conduct because it is necessary to secure the law enforcement objective.[7] A few years later, the Court rejected attempts to read *Russell*

---

[3] *Warren Petroleum Co.* v. *Thomasson*, 265 F.2d 5, 10 (5th Cir. 1959); *Lilly* v. *West Virginia*, 29 F.2d 61, 64 (4th Cir. 1928); *City of Norfolk* v. *McFarland*, 145 F.Supp. 258, 260 (E.D. Va. 1956); *State* v. *Swift*, 143 A.2d 114, 115 (N.H. 1958).

[4] *State of Montana* v. *Christopher*, 345 F. Supp. 60, 61 (D. Mont. 1972) (operating trailer without lights); *State* v. *Knoxville*, 80 Tenn. 146 (1883) (open field burning by city officials not a nuisance when necessary to prevent spread of disease).

[5] *State* v. *Emerson*, 517 P.2d 245, 247 (Wash. Ct. App. 1974) (accepting services of prostitute) ("Practical considerations require that, in the performance by police of crime detection duties, at least some deceitful practices and 'a limited participation' in unlawful practices be tolerated and recognized as lawful."); *State* v. *Torphy*, 78 Mo. App. 206 (1899) (gambling).

[6] *See* Sears & Weihofen, *supra* note 2; Dix, "Undercover Investigations and Police Rulemaking," 53 Tex. L. Rev. 203, 284–86 (1975).

[7] The Court indicated that there might be a situation in which the Government's involvement was so outrageous that it would offend due process principles, but "the instant case is not of that breed." *United States* v. *Russell*, 411 U.S. at 432. Nor has the Court found such a case since *Russell*.

286

narrowly when it affirmed a conviction in which the government had allegedly supplied the heroin which the defendant was charged with selling. *Hampton* v. *United States*, 425 U.S. 484 (1976). Even though heroin is contraband and its possession is "illegal and constituted the corpus delicti for the sale of which the petitioner was convicted," the Court rejected the argument that the Government's involvement "deprived defendant of any right secured to him by the Constitution." 425 U.S. at 489, 490–91 (Rehnquist, J.) (plurality opinion). "Government participation ordinarily will be fully justified in society's 'war with the criminal classes.'" *Id.* at 495 (Powell, J., concurring) (citation omitted).[8] Since *Hampton*, the courts of appeal have explicitly and repeatedly upheld a variety of undercover techniques that technically violate a variety of civil and criminal statutes but whose use has been deemed necessary to particular undercover operations.[9]

## Conclusion

We believe, therefore, that the courts have recognized that it is generally lawful for law enforcement agents to disregard otherwise applicable law when taking action that is necessary to attain the permissible law enforcement objective, when the action is carried out in a reasonable fashion,[10] and when the action does not otherwise violate the Constitution.[11] Pursuant to this general principle, this Office has repeatedly advised various agencies, including the Department of State, that the use of false documents in particular undercover operations is legal. *See, e.g.*, Memorandum for Roberts B. Owen, Legal Adviser, Department of State, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel (July 3, 1980) (regarding issuance of false passports).

---

[8] Both Justice Rehnquist and Justice Powell recognized that government involvement in otherwise illegal activities may at some point go beyond what is necessary and become punishable. 425 U.S. at 490–91; *id.* at 494 nn.5 & 6. Justice Rehnquist noted that "If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." *Id.* at 490. Justice Powell felt that there should be some limiting principle on government involvement in crime, but did not believe it was necessary to develop the principle in *Hampton. Id* at 494 nn.5 & 6. One principle that might be used is to permit acts that involve *malum prohibitum*, such as possession of contraband or obtaining false birth certificates, but to forbid activities that involve *malum in se*, such as homicide and assault.

[9] *See, e.g., United States* v. *Gamble*, 737 F.2d 853, 854, 858 (10th Cir. 1984) (postal workers obtained false drivers licenses, filed false accident reports, obtained insurance and registered cars under false names, pled guilty to nonexistent traffic violations and filed false claims with insurance companies); *United States* v. *Beverly*, 723 F.2d 11, 12 (3d Cir. 1983) (government supplied gasoline and disguises to arsonist); *United States* v. *McCown*, 711 F.2d 1441, 1449 50 (9th Cir. 1983) (government supplied marijuana); *United States* v. *Romano*, 706 F.2d 370, 372 (2d Cir. 1983) (government supplied heroin); *United States* v. *Khatib*, 706 F.2d 213, 217 (7th Cir. 1983) (government sold unregistered firearms); *United States* v. *Norton*, 700 F.2d 1072, 1076 (6th Cir.) (government supplied explosives for bomb), *cert. denied*, 461 U.S. 910 (1983); *United States* v. *Gianni*, 678 F.2d 956, 958 (11th Cir.) (government sold over 1000 pounds of marijuana), *cert. denied*, 459 U.S. 1071 (1982); *United States* v. *Parisi*, 674 F.2d 126, 127 (1st Cir. 1982) (government sold food stamps at illegal discount).

[10] Thus, a police officer may speed but the court will evaluate whether, under the circumstances, he exercised reasonable care for the safety of third parties. *State* v. *Swift*, 143 A.2d 114, 115 (N.H. 1958); *Edberg* v. *Johnson*, 184 N.W. 12, 13 14 (Minn. 1921).

[11] *United States* v. *United States District Court*, 407 U.S. 297 (1972); *Lewis* v. *United States*, 385 U.S. 206, 209 (1966); *Zweibon* v. *Mitchell*, 516 F.2d 594 (D.C. Cir. 1975), *cert. denied*, 425 U.S. 944 (1976).

In the instant case, there is nothing in the language of 8 U.S.C. § 1201(g)(3) that suggests that Congress intended to restrict the use of visas in undercover operations. Moreover, the ultimate objective of § 1201(g) to prevent manipulation of the visa process will not be frustrated by this operation. Rather, as in many undercover operations, the Government's activity will involve "limited participation" in the methods of suspected criminals in order to achieve the ultimate objective of ending the criminal behavior. *Russell*, 411 U.S. at 433. Accordingly, we conclude that the issuance of a visa by the Department of State is necessary for the operation to proceed; that the issuance under the circumstances described — for a limited purpose and under close supervision — is reasonable; and that the issuance of the visa is, therefore, legal notwithstanding the language in 8 U.S.C. § 1201(g).

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*