COLLINS ET AL. *v.* HARDYMAN ET AL.

No. 217.   Argued January 8–9, 1951.—Decided June 4, 1951.

*Aubrey N. Irwin* argued the cause and filed a brief for petitioners.

*A. L. Wirin* and *Loren Miller* argued the cause for respondents. With *Mr. Wirin* on the brief were *Fred Okrand, William Egan Colby, Edward J. Ennis, Osmond K. Fraenkel, Will Maslow, Joseph B. Robison* and *Clore Warne.*

Briefs of *amici curiae* urging affirmance were filed by *Arthur J. Goldberg* and *Thomas E. Harris* for the Congress of Industrial Organizations; and *Loren Miller* and *Thurgood Marshall* for the National Association for the Advancement of Colored People.

MR. JUSTICE JACKSON delivered the opinion of the Court.

This controversy arises under 8 U. S. C. § 47 (3), which provides civil remedies for certain conspiracies.[1] A motion to dismiss the amended complaint raises the issue of its sufficiency and, of course, requires us to accept its well-pleaded facts as the hypothesis for decision.

---

[1] 17 Stat. 13, 8 U. S. C. § 47 (3) reads:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any

Its essential allegations are that plaintiffs are citizens of the United States, residents of California, and members or officers of a voluntary association or political club organized for the purpose of participating in the election of officers of the United States, petitioning the national government for redress of grievances, and engaging in public meetings for the discussion of national public issues. It planned a public meeting for November 14, 1947, on the subject, "The Cominform and the Marshall Plan," at which it was intended to adopt a resolution opposing said Marshall Plan, to be forwarded, by way of a petition for the redress of grievances, to appropriate federal officials.

The conspiracy charged as being within the Act is that defendants, with knowledge of the meeting and its pur-

---

citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

This paragraph should be read in the context of other paragraphs of the same section, and note should also be taken of 8 U. S. C. § 43, which reads:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

poses, entered into an agreement to deprive the plaintiffs, "as citizens of the United States, of privileges and immunities, as citizens of the United States, of the rights peaceably to assemble for the purpose of discussing and communicating upon national public issues . . . ." And further, "to deprive the plaintiffs as well as the members of said club, as citizens of the United States, of equal privileges and immunities under the laws of the United States . . . ." This is amplified by allegations that defendants knew of many public meetings in the locality, at which resolutions were adopted by groups with whose opinions defendants agreed, and with which defendants did not interfere or conspire to interfere. "With respect to the meeting aforesaid on November 14, 1947, however, the defendants conspired to interfere with said meeting for the reason that the defendants opposed the views of the plaintiffs . . . ."

In the effort to bring the case within the statute, the pleader also alleged that defendants conspired "to go in disguise upon the highways" and that they did in fact go in disguise "consisting of the unlawful and unauthorized wearing of caps of the American Legion." The District Court disposed of this part of the complaint by holding that wearing such headgear did not constitute the disguise or concealment of identity contemplated by the Act. Plaintiffs thereupon abandoned that part of the complaint and do not here rely upon it to support their claims.

The complaint then separately sets out the overt acts of injury and damage relied upon to meet the requirements of the Act. To carry out the conspiracy, it is alleged, defendants proceeded to the meeting place and, by force and threats of force, did assault and intimidate plaintiffs and those present at the meeting and thereby broke up the meeting, thus interfering with the right of the plaintiffs to petition the Government for

redress of grievances. Both compensatory and punitive damages are demanded.

It is averred that the cause of action arises under the statute cited and under the Constitution of the United States. But apparently the draftsman was scrupulously cautious not to allege that it arose under the Fourteenth Amendment, or that defendants had conspired to deprive plaintiffs of rights secured by that Amendment, thus seeking to avoid the effect of earlier decisions of this Court in Fourteenth Amendment cases.

The complaint makes no claim that the conspiracy or the overt acts involved any action by state officials, or that defendants even pretended to act under color of state law. It is not shown that defendants had or claimed any protection or immunity from the law of the State, or that they in fact enjoyed such because of any act or omission by state authorities. Indeed, the trial court found that the acts alleged are punishable under the laws of California relating to disturbance of the peace, assault, and trespass, and are also civilly actionable.[2]

---

[2] The opinion of District Judge Yankwich for this cites in his notes, 80 F. Supp. 501, 510:

"39. Cal. Penal Code, Section 415 (disturbance of the peace of neighborhood or person); Section 403 (disturbance of public meetings)

"40. Cal. Penal Code, Section 602 (j) (illegal entry for the purpose of injuring property or property rights or interfering or obstructing lawful business of another).

"41. Cal. Penal Code, Sections 240, 241 (assault); sections 242, 243 (battery). Among the corresponding civil sections relating to civil remedies are California Civil Code, Section 43 (guarantee against personal bodily harm or restraint); Government Code, Section 241 (defining as citizens all persons born or residing within the state); California Code of Civil Procedure, Section 338 (3) [Section 338 (2)] (action for trespass to real property may be brought within three years); section 340 (3) (action for assault and battery may be brought within one year). And for the state civil rights provisions, see California Civil Code, Sections 51–54."

The District Judge held that the statute does not and cannot constitutionally afford redress for invasions of civil rights at the hands of individuals, but can only be applied to injuries to civil rights by persons acting pursuant to or under color of state law.[3]  In reversing the District Court's dismissal of the complaint, the Court of Appeals for the Ninth Circuit held otherwise, one judge dissenting.[4]  The Court of Appeals for the Eighth Circuit, in *Love* v. *Chandler,* 124 F. 2d 785, has ruled in accord with the District Judge and the dissenting Court of Appeals Judge here.[5]  To resolve the conflict, we granted certiorari.[6]

This statutory provision has long been dormant.  It was introduced into the federal statutes by the Act of April 20, 1871, entitled, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes."[7]  The Act was among the last of the reconstruction legislation to be based on the "conquered province" theory which prevailed in Congress for a period following the Civil War.  This statute, without separability provisions, established the civil liability with which we are here concerned as well as other civil liabilities, together with parallel criminal liabilities.  It also provided that unlawful combinations and conspiracies named in the Act might be deemed rebellions, and authorized the President to employ the militia to suppress them.  The President was also authorized to suspend the privilege of the writ of habeas corpus. It prohibited any person from being a federal grand or

---

[3] 80 F. Supp. 501.

[4] 183 F. 2d 308.

[5] Other recent cases involving the statute are *Viles* v. *Symes,* 129 F. 2d 828; *Robeson* v. *Fanelli,* 94 F. Supp. 62; and *Ferrer* v. *Fronton Exhibition Co.,* 188 F. 2d 954.

[6] 340 U. S. 809.

[7] 17 Stat. 13.

petit juror in any case arising under the Act unless he took and subscribed an oath in open court "that he has never, directly or indirectly, counselled, advised, or voluntarily aided any such combination or conspiracy." Heavy penalties and liabilities were laid upon any person who, with knowledge of such conspiracies, aided them or failed to do what he could to suppress them.

The Act, popularly known as the Ku Klux Act, was passed by a partisan vote in a highly inflamed atmosphere. It was preceded by spirited debate which pointed out its grave character and susceptibility to abuse, and its defects were soon realized when its execution brought about a severe reaction.[8]

The provision establishing criminal conspiracies in language indistinguishable from that used to describe civil conspiracies came to judgment in *United States* v. *Harris*, 106 U. S. 629.[9] It was held unconstitutional. This decision was in harmony with that of other important decisions during that period[10] by a Court, every member of

---

[8] The background of this Act, the nature of the debates which preceded its passage, and the reaction it produced are set forth in Bowers, The Tragic Era, 340–348.

[9] R. S. § 5519, under which the prosecution was brought, provided: "If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; each of such persons shall be punished by a fine of not less than five hundred nor more than five thousand dollars, or by imprisonment, with or without hard labor, not less than six months nor more than six years, or by both such fine and imprisonment."

[10] *Slaughter-House Cases*, 16 Wall. 36; *United States* v. *Reese*, 92 U. S. 214; *United States* v. *Cruikshank*, 92 U. S. 542; *Civil Rights Cases*, 109 U. S. 3.

which had been appointed by President Lincoln, Grant, Hayes, Garfield or Arthur—all indoctrinated in the cause which produced the Fourteenth Amendment, but convinced that it was not to be used to centralize power so as to upset the federal system.

While we have not been in agreement as to the interpretation and application of some of the post-Civil War legislation,[11] the Court recently unanimously declared, through the Chief Justice:

> "Since the decision of this Court in the *Civil Rights Cases,* 109 U. S. 3 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful."[12]

And MR. JUSTICE DOUGLAS, dissenting, has quoted with approval from the *Cruikshank* case, " 'The fourteenth amendment prohibits a State from denying to any person within its jurisdiction the equal protection of the laws; but this provision does not, any more than the one which precedes it . . . add anything to the rights which one citizen has under the Constitution against another.' 92 U. S. at pp. 554–555." And " 'The only obligation resting upon the United States is to see that the States do not deny the right. This the amendment guarantees, but no more. The power of the national government is limited to the enforcement of this guaranty.' " He summed up: "The Fourteenth Amendment protects the individual against *state action,* not against wrongs done by *individuals.* . . ."[13]

---

[11] *Screws* v. *United States,* 325 U. S. 91.

[12] *Shelley* v. *Kraemer,* 334 U. S. 1, 13.

[13] *United States* v. *Williams,* 341 U. S. 70, 92.

It is apparent that, if this complaint meets the requirements of this Act, it raises constitutional problems of the first magnitude that, in the light of history, are not without difficulty. These would include issues as to congressional power under and apart from the Fourteenth Amendment, the reserved power of the States, the content of rights derived from national as distinguished from state citizenship, and the question of separability of the Act in its application to those two classes of rights. The latter question was long ago decided adversely to the plaintiffs. *Baldwin* v. *Franks,* 120 U. S. 678. Before we embark upon such a constitutional inquiry, it is necessary to satisfy ourselves that the attempt to allege a cause of action within the purview of the statute has been successful.

The section under which this action is brought falls into two divisions. The forepart defines conspiracies that may become the basis of liability, and the latter portion defines overt acts necessary to consummate the conspiracy as an actionable wrong. While a mere unlawful agreement or conspiracy may be made a federal crime, as it was at common law,[14] this statute does not make the mere agreement or understanding for concerted action which constitutes the forbidden conspiracy an actionable wrong unless it matures into some action that inflicts injury. That, we think, is the significance of the second division of the section.

The provision with reference to the overt act will bear repeating, with emphasis supplied: ". . . [I]n any case of *conspiracy set forth in this section,* if one or more persons engaged therein do, or cause to be done, *any act in furtherance of the object of such conspiracy,* whereby an-

[14] *Nash* v. *United States,* 229 U. S. 373, 378; *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 252.

other is *injured* in his person or property, or *deprived of having and exercising any right or privilege of a citizen of the United States,* the party so injured or deprived may have an action for the recovery of damages . . . ."

In the light of the dictum in *United States* v. *Cruikshank,* 92 U. S. 542, 552, we assume, without deciding, that the facts pleaded show that defendants did deprive plaintiffs "of having and exercising" a federal right which, provided the defendants were engaged in a "conspiracy set forth in this section," would bring the case within the Act.

The "conspiracy" required is differently stated from the required overt act and we think the difference is not accidental but significant. Its essentials, with emphasis supplied, are that two or more persons must conspire (1) for the purpose of *depriving* any person or class of persons of the *equal protection of the laws,* or of *equal privileges and immunities under the law;* or (2) for the purpose of preventing or hindering the constituted authorities from giving or securing to all persons the equal protection of the laws; or (3) to prevent by force, intimidation, or threat, any citizen entitled to vote from giving his support or advocacy in a legal manner toward election of an elector for President or a member of Congress; or (4) to injure any citizen in person or property on account of such support or advocacy. There is no claim that any allegation brings this case within the provisions that we have numbered (2), (3), and (4), so we may eliminate any consideration of those categories. The complaint is within the statute only if it alleges a conspiracy of the first described class. It is apparent that this part of the Act defines conspiracies of a very limited character. They must, we repeat, be "for the purpose of *depriving* . . . of the *equal protection of the laws,* or of *equal privileges and immunities under the laws.*" (Italics supplied.)

Passing the argument, fully developed in the *Civil Rights Cases,* that an individual or group of individuals not in office cannot *deprive* anybody of constitutional rights, though they may invade or violate those rights, it is clear that this statute does not attempt to reach a conspiracy to deprive one of rights, unless it is a deprivation of equality, of "equal protection of the law," or of "equal privileges and immunities under the law." That accords with the purpose of the Act to put the lately freed Negro on an equal footing before the law with his former master. The Act apparently deemed that adequate and went no further.

What we have here is not a conspiracy to affect in any way these plaintiffs' equality of protection by the law, or their equality of privileges and immunities under the law. There is not the slightest allegation that defendants were conscious of or trying to influence the law, or were endeavoring to obstruct or interfere with it. The only inequality suggested is that the defendants broke up plaintiffs' meeting and did not break up meetings of others with whose sentiments they agreed. To be sure, this is not equal injury, but it is no more a deprivation of "equal protection" or of "equal privileges and immunities" than it would be for one to assault one neighbor without assaulting them all, or to libel some persons without mention of others. Such private discrimination is not inequality before the law unless there is some manipulation of the law or its agencies to give sanction or sanctuary for doing so. Plaintiffs' rights were certainly invaded, disregarded and lawlessly violated, but neither their rights nor their equality of rights under the law have been, or were intended to be, denied or impaired. Their rights *under the laws* and to *protection of the laws* remain untouched and equal to the rights of every other Californian, and may be vindicated in the same way and with the same effect as

those of any other citizen who suffers violence at the hands of a mob.

We do not say that no conspiracy by private individuals could be of such magnitude and effect as to work a deprivation of equal protection of the laws, or of equal privileges and immunities under laws. Indeed, the post-Civil War Ku Klux Klan, against which this Act was fashioned, may have, or may reasonably have been thought to have, done so. It is estimated to have had a membership of around 550,000, and thus to have included "nearly the entire adult male white population of the South." [15] It may well be that a conspiracy, so far-flung and embracing such numbers, with a purpose to dominate and set at naught the "carpetbag" and "scalawag" governments of the day, was able effectively to deprive Negroes of their legal rights and to close all avenues of redress or vindication, in view of the then disparity of position, education and opportunity between them and those who made up the Ku Klux Klan. We do not know. But here nothing of that sort appears. We have a case of a lawless political brawl, precipitated by a handful of white citizens against other white citizens. California courts are open to plaintiffs and its laws offer redress for their injury and vindication for their rights.

We say nothing of the power of Congress to authorize such civil actions as respondents have commenced or otherwise to redress such grievances as they assert. We think that Congress has not, in the narrow class of conspiracies defined by this statute, included the conspiracy charged here. We therefore reach no constitutional questions. The facts alleged fall short of a conspiracy to alter, impair or deny equality of rights under the law, though they do show a lawless invasion of rights for which

---

[15] 8 Encyc. Soc. Sci. 606, 607.

there are remedies in the law of California. It is not for this Court to compete with Congress or attempt to replace it as the Nation's law-making body.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE BURTON, with whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS concur, dissenting.

I cannot agree that the respondents in their complaint have failed to state a cause of action under R. S. § 1980 (3), 8 U. S. C. § 47 (3).

The right alleged to have been violated is the right to petition the Federal Government for a redress of grievances. This right is expressly recognized by the First Amendment and this Court has said that "The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States* v. *Cruikshank,* 92 U. S. 542, 552, and see *In re Quarles and Butler,* 158 U. S. 532, 535. The source of the right in this case is not the Fourteenth Amendment. The complaint alleges that petitioners "knowingly" did not interfere with the "many public meetings" whose objectives they agreed with, but that they did conspire to break up respondents' meeting because petitioners were opposed to respondents' views, which were expected to be there expressed. Such conduct does not differ materially from the specific conspiracies which the Court recognizes that the statute was intended to reach.

The language of the statute refutes the suggestion that action under color of state law is a necessary ingredient of the cause of action which it recognizes. R. S. § 1980 (3) speaks of "two or more persons in any State or Territory" conspiring. That clause is not limited to state

officials. Still more obviously, where the section speaks of persons going "in disguise on the highway . . . for the purpose of depriving . . . any person or class of persons of the equal protection of the laws," it certainly does not limit its reference to actions of that kind by state officials. When Congress, at this period, did intend to limit comparable civil rights legislation to action under color of state law, it said so in unmistakable terms. In fact, R. S. § 1980 (3) originally was § 2 of the Act of April 20, 1871, and § 1 of that same Act said "That any person who, *under color of any law,* statute, ordinance, regulation, custom, or usage of any State, shall subject . . . any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall . . . be liable to the party injured . . . ." (Emphasis added.) 17 Stat. 13.

Congress certainly has the power to create a federal cause of action in favor of persons injured by private individuals through the abridgment of federally created constitutional rights. It seems to me that Congress has done just this in R. S. § 1980 (3). This is not inconsistent with the principle underlying the Fourteenth Amendment. That amendment prohibits the respective states from making laws abridging the privileges or immunities of citizens of the United States or denying to any person within the jurisdiction of a state the equal protection of the laws. Cases holding that those clauses are directed only at state action are not authority for the contention that Congress may not pass laws supporting rights which exist apart from the Fourteenth Amendment.

Accordingly, I would affirm the judgment of the Court of Appeals.