UNITED STATES of America, Plaintiff,

v.

James Griggs RAINES, Dixon Oxford, Roscoe Radford, Registrars of Terrell County, Georgia, F. Lawson Cook, Sr. and Mrs. F. Lawson Cook, Sr., Deputy Registrars, Defendants.

Civ. A. No. 442.

United States District Court
M. D. Georgia,
Americus Division.

April 16, 1959.

554

W. Wilson White, Asst. Atty. Gen., Frank O. Evans, U. S. Atty., Macon, Ga., Ben Brooks, Atty., Dept. of Justice, Washington, D. C., for the Government.

Bloch, Hall, Groover & Hawkins, Macon, Ga., Charles J. Bloch and Ellsworth Hall, Jr., Macon, Ga., of counsel, Peter Zack Geer, Colquitt, Ga., Robert L. Russell, Jr., Winder, Ga., for defendants.

DAVIS, Chief Judge.

This is an action instituted by the Attorney General of the United States in the name of and on behalf of the United States under the provisions of the Civil Rights Act of 1957. The complaint is one seeking preventive relief against the alleged deprivation of voting rights of certain named persons on account of their race or color. The action is brought against James Griggs Raines, Dixon Oxford, Roscoe Radford, Registrars of Terrell County, Georgia, F. Lawson Cook, Sr., and Mrs. F. Lawson Cook, Sr., Deputy Registrars of Terrell County, Georgia. It is alleged that these defendants have engaged in wrongful acts and practices, which will deprive other-wise qualified persons of the right to vote because of their race or color. No attack is made upon any State law, but rather, it is alleged that the wrongful deprivation of voting rights will result from the improper and wrongful administration of the Georgia Registration laws by the named defendants. It is against this allegedly wrongful administration of the registration laws that this complaint seeks relief.

The complaint was filed on September 4, 1958. On September 23, 1958, a motion to dismiss said action was filed on behalf of all named defendants. This motion was set down for hearing in Americus, Georgia, on January 26, 1959. Briefs were subsequently filed by counsel for all parties. Reply briefs and supplemental briefs were likewise filed. The Court has given careful consideration to the pleadings, oral arguments and extensive and exhaustive briefs filed with the Court.

The motion to dismiss is based primarily upon four main grounds. The first is the unconstitutionality of the section authorizing the Attorney General to file this action. This contention is grounded on two arguments. The defendants argue that the sections involved are not appropriate legislation within the meaning of Section 2 of the Fifteenth Amendment to the Constitution of the United States. Secondly, they urge that Congress had no authority to authorize the Attorney General to file a suit of this nature, since it is neither an action in law or equity. This deals in part with the authority of Congress to authorize the grant of an injunction without regard to exhaustion of other available remedies. The second main ground of the motion to dismiss is the failure of the complaint to state a cause of action under the Civil Rights Act of 1957, even if constitutional. The third ground asserts that the cause should be dismissed by the Court in the exercise of its sound discretion. Because of the Court's ultimate judgment in this matter and to facilitate clarity of presenta-

tion, these grounds will be considered in reverse order.

In the third ground of their motion, the defendants argue that the Court should exercise its discretion and deny the relief sought, even though it be decided that the Act under which it is brought is constitutional and the complaint states a cause of action under the statute. In support of this ground, it was pointed out that no emergency existed, such as that contemplated by Congress when this Act was enacted. Though a general election was held in Georgia in November, 1958, this complaint did not seek a temporary restraining order, or any other remedy which might have enabled the allegedly wronged parties to vote in that election. It seeks instead to secure an injunction at a time when the next scheduled election is over a year in the future. The defendants argue that the State can afford the desired remedy prior to any election and that no such emergency exists as would justify this Court's intervention.

While some of the language of the Congressional hearings does indicate that this remedy was primarily designed for emergency use, the wording of the statute imposed no such limitation. This Court cannot so limit the applicability of the statute. Similarly, the failure of the complaint to seek such relief as might have protected the voting rights of the allegedly wronged parties prior to the November election does not impede the operation of the statute. It may raise some question as to the motive of the litigation, but the Court without hearing any of the evidence would not be disposed to dismiss the proceedings in the exercise of its discretion. It is true that equitable relief may be denied in the exercise of the Court's discretion, but it should be a discretion informed by evidence. The Court is of the opinion that, based on the complaint alone, it is not in possession of sufficient facts to dismiss the complaint in the exercise of its sound discretion.

The Court next comes to a consideration of the question of whether or not this complaint states a cause of action under the provisions of 42 U.S.C. A. § 1971. The complaint alleges that the defendants, as individuals, acting in the exercise of their state given authority as registrars and deputy registrars of Terrell County, Georgia, engaged in certain acts and practices, designed and intended to deny otherwise qualified persons the right to vote because of their race and color. It is alleged that they delayed handling of Negro applications for registration, arbitrarily refused to register Negroes who demonstrated their qualification to vote, and for purposes of discrimination, applied more difficult and stringent registration standards to Negro applicants than to white applicants.

It is further alleged that registration is a legal prerequisite to voting in Georgia, and that this discrimination in administration of registration procedures was on account of the race of the applicants.

There can be no question but that these allegations are sufficient to bring the allegedly wrongful conduct of the defendants within the coverage of 42 U.S.C.A. § 1971. Whether that statute be construed as one limited to state action, as argued by the United States, or as extending to purely individual action, as contended by the defendants, the language of the complaint would state a cause of action. It alleges that these defendants have engaged in certain acts or practices which will deprive others of their right to vote, when otherwise qualified, without distinction as to race or color. The acts and practices alleged are those of the defendants while acting (even though wrongfully) in the exercise of state given authority. Thus, under any reading of the statute, the facts alleged make out a cause of action.

So it is, that this is not a case such as Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253, where the Court can avoid the question of consti-

tutionality. Having determined that none of the other grounds of the Motion to Dismiss are valid, the Court now passes to the final and most important point raised by that motion; to-wit, the constitutionality of the Act under which this action is brought.

The first prong of the constitutional attack on the statute questions the authority of Congress to authorize the Attorney General to bring an action in this Court, which is neither an action in law or equity. It is urged that this is not a legal action, seeking as it does injunctive relief. On the other hand, it is argued that it is not an equitable action, since it violates one of the oldest rules of equity, the unavailability of the injunctive process where other legal remedies are available. The defendants thus contend that this is neither a suit in law or equity, and that Congress had no right to authorize it. This Court cannot accept this contention.

▆▆▆ While a court may question the wisdom of overruling an old and well established maxim of equity, the Court knows of no limitation on the powers of Congress to legislate in this field. The fact that Congress in subsection (d) of Section 1971 provided that the courts shall exercise that jurisdiction "without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law", does not change the nature of this action from one in equity. It merely provides that in such an equitable proceeding a certain well established principle shall not be applicable. The Court knows of no limitation on the right of Congress to so legislate. It is well known that the Federal Courts have often refused to act because the complainants had failed to exhaust their other remedies. Peay v. Cox, 5 Cir., 190 F. 2d 123, 125. This rule, however, could hardly be applied where Congress has expressly directed the courts to exercise their jurisdiction without regard to such fact.

The defendants contend that such a limitation of the court's exercise of their jurisdiction is an invasion by the legislative branch of matters properly committed to the judicial branch and thus violative of the separation of powers doctrine. The Court is far from convinced as to the soundness of this argument, but has not explored it extensively because it does not seem necessary, in view of the ultimate disposition of this motion.

This brings us, finally, to what appears to be the most substantial contention of the defendants; that is, that 42 U.S.C.A. § 1971 is not appropriate legislation within the meaning of Section 2 of the Fifteenth Amendment and exceeds the jurisdiction of the Congress.

It should be noted at the outset that this action is one brought by the Attorney General in the name of and on behalf of the United States. It is not an action by the allegedly wronged party under the provisions of 42 U.S.C.A. § 1983, and differs materially from those cases. In that type of case, the "self executing ban" of the Fifteenth Amendment proscribes certain conduct and Section 1983 provides a remedy therefor, without resort to 42 U.S.C.A. § 1971. It was the availability of this "self executing ban" which has heretofore allowed the Supreme Court to apparently by-pass a clear ruling on the constitutionality of Section 1971(a). Terry v. Adams, 345 U.S. 461, 481, 73 S.Ct. 809, 97 L.Ed. 1252.

In the instant case, however, the Attorney General has no standing for the bringing of this action, except the recently enacted provisions of Section 1971. Any right that he has to seek preventive relief, where citizens allegedly have been or are about to be denied their right to vote on account of race, is based on Section 1971(c). Prior to its enactment, such an action could not have been entertained. Thus, it is that the question of the constitutionality of that Section cannot be sidestepped or bypassed. Due to the wording of subsection (c) of the statute and the way in which it is tied to subsection (a), the latter must

also be given its first really critical examination.

■ As originally enacted and as it remained on the statute books of this country from 1870 until 1957, the present subsection (a), (formerly Section 1971 in its entirety), was merely a general statement of principle or of rights, without providing any sanction or remedy for its violation. United States v. Reese, 92 U.S. 214, 23 L.Ed. 563; United States v. Cruikshank, 92 U.S. 542, 23 L. Ed. 588. For this reason, no action could ever be based upon this section alone. Many actions were filed under Sections 1983 and 1971, relying also on the Fifteenth Amendment. It will be noted that in any suit filed under Section 1983, there could be no question such as is here presented, since Section 1983 is applicable only to persons acting "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." By its unmistakably clear language, Section 1983 did not authorize any action for purely private acts, even though such practices resulted in a person being deprived of the right to vote on account of his race.

This brings into focus the question which is now presented for determination by this Court. Under Section 1971 as passed in 1957, is the Attorney General permitted to institute proceedings for preventive relief, where the alleged wrongful deprivation is that of a private citizen, not a state officer, not acting under color of any state law, custom or usage?

■ In considering this question, we must close our mind to the allegations of the complaint in the instant case. The question is, not what the Attorney General has done here, but what Congress has authorized him to do. As was clearly demonstrated in the case of United States v. Reese, 92 U.S. 214, 23 L.Ed. 563, where a statute is enacted in general terms sufficiently broad to apply to wrongful acts, outside as well as within the constitutional jurisdiction of Congress, such a statute cannot be limited by judicial construction so as to make it operate only on that which Congress might rightfully prohibit. "To limit this statute in the manner now asked would be to make a new law, not to enforce an old one." *Ibid.* It is well to note that the Supreme Court was there considering one section of the Act of 1870, of which Section 1971(a) was a part.

Thus, it is not for this Court to decide whether this particular fish is properly within the net, but whether the net is so large as to catch many fish not properly within it.

■ It is clear beyond question, that the Fifteenth Amendment to the Constitution relates "solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts." James v. Bowman, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979. The statute which is here under consideration, as did the one in the above cited case, "on its face * * * purports to be an exercise of the power granted to Congress by the 15th Amendment." "[T]he government of the United States is one of delegated, limited, and enumerated powers. * * * Therefore, every valid act of congress must find in the constitution some warrant for its passage." United States v. Harris, 106 U.S. 629, 1 S.Ct. 601, 606, 27 L.Ed. 290. The power of Congress to legislate at all upon the subject of voting at State elections rests upon the Fifteenth Amendment. Prior to its enactment there was no constitutional guaranty against discrimination on account of race, color or previous condition of servitude. United States v. Reese, 92 U.S. 214, 23 L.Ed. 563.

■ Thus, it will be seen that, if Section 1971(c) is constitutional, it is because of the power given Congress by the Fifteenth Amendment. As stated, that Amendment relates solely to action by the United States or by any State and does not contemplate wrongful individual acts. The Court is mindful, of course, of the cases holding that a state acts through its lawfully constituted officials and that action by one exercising

his state given authority (even though wrongly exercising it) constitutes state action. Thus, for present purposes, it will be assumed that the Fifteenth Amendment authorizes Congress, by appropriate legislation, to prohibit and punish deprivation of voting privileges on account of race or color by any State or by the officers of any State while in the exercise of state given authority. It does not, however, authorize Congress to prohibit or punish purely individual and private action depriving another of his right to vote on account of his race or color.

This brings us to the meat of the controversy here: What does Section 1971 (c) seek to do? Is it limited to state action, as previously defined, or is it sufficiently broad to encompass wrongful action by individuals?

In determining the scope of Section 1971(c), the Court must first consider the language of that section. Is there any limitation within the section itself? The section, as enacted in 1957, reads as follows:

> "Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person." 42 U.S.C.A. § 1971(c).

It will be noted at the outset that the section itself includes no limitation as to the persons subject to suit under it. It includes *any person* engaging in or about to engage in a certain type of conduct. By its own terms the section is applicable to any person engaging in the type of action described therein. Thus, it follows that the only limitation, if any there be, must come from the act or practice described therein. In other words, any person capable of engaging in the type of act or practice described would be subject to suit by the Attorney General. If any person other than one clothed with state authority can engage in such act or practice, then the section is broad enough to allow suit against him and is not limited to state action. It will be particularly noted that the section makes no reference to color of law, a phrase with which the Congress is very familiar, having used it in other sections of this, as well as other Civil Rights Acts. More will be said about this later.

Now, what is the proscribed act or practice which brings this section into play? It is not any act or practice which would deprive another of his rights under the Fifteenth Amendment. If that were the language, there could be no doubt about its limitation to state action, since a private citizen acting individually cannot deprive another of his rights under the Fifteenth Amendment. As argued in James v. Bowman, 190 U.S. 127, 135, 23 S.Ct. 678, 47 L.Ed. 979, a statute in such general language aimed only at such acts as deprived another of whatever rights he had under the Fifteenth Amendment, could not be unconstitutional. It would just be up to the Courts then to determine in each case whether or not the statute applied to the conduct alleged in the complaint. The statute itself would proscribe only that which violated the Amendment. Any set of facts falling short of a violation of the Amendment would not state a cause of action under the statute.

Here, however, Congress did not so limit the statute. The action proscribed therein is "any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section." Again we come to the question: Can any person other than one clothed with the authority of the State engage in such an act or

practice? To properly determine that, we must first determine what rights and privileges are secured by subsection (a) of Section 1971. (All parties concede that subsection (b) is not here involved).

■■■■ Subsection (a) of 42 U.S.C.A. § 1971 was originally passed in 1870, as a part of what was known as the Enforcement Act, consisting of 23 sections, 16 Stat. 140. It was enacted soon after the adoption of the 14th and 15th Amendments. It was in some respects a sort of preamble to the Enforcement Act, in that it merely stated a right or privilege, while the sections that followed it sought to establish remedies for specific violations of civil rights. The section, as originally enacted, was re-enacted in 1957 as subsection (a) of Section 1971. Theretofore it had been the entire section.

The subsection reads, as follows:

"All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." 42 U.S.C.A. § 1971 (a).

Now, what is the right or privilege secured by this subsection? In this Court's opinion, it is the right and privilege of all persons otherwise qualified to vote to be entitled and allowed to vote, without distinction of race or color and to effectuate this right all state constitutional provisions, laws, customs, usages and regulations to the contrary are expressly set aside.

But, this right to be entitled and allowed to vote, as stated, is not simply the right to be free of state interference but is the right to be free of interference from any source on account of one's race or color. It may be that the word "entitled", as used, carries with it some idea of state action only, since entitlement to vote can come from the state alone and can be denied only by the state, acting through its officials. Entitlement is a legal status, which can neither be conferred nor denied by a private citizen. But, the phrase "allowed to vote" carries with it no such idea of state action or legal status. It denotes the physical action of voting and it may be interfered with or denied to another by any person, state official or private citizen. A person who is kidnapped at the polls and spirited away has been denied his right to be allowed to vote. One who is prevented from voting through threats or intimidation has been denied his right to be allowed to vote, just as completely as if the poll manager had refused to accept his ballot. It thus appears to this Court that the right secured by this subsection is such a right of which a person can be deprived, by the act or practice of any other person, state official or private citizen.

This view is strengthened by a look at the other provisions of the Enforcement Act of 1870, of which this subsection, verbatim, was the first section. As previously stated, it was a sort of preamble to that Act, in that it stated general principles while the following sections contained the "teeth".

The Court feels that it is, therefore, proper to consider the fact that in Section 5 of the Enforcement Act of 1870, Congress made it a crime for any individual to hinder, control or intimidate others by bribery or threats from exercising their right of suffrage guaranteed by the Fifteenth Amendment. While this section was declared unconstitutional in the case of James v. Bowman, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979, on the same grounds here urged, and is no longer on the books, it does have some bearing, in that it reflects the thinking of the Congress which originally enacted this legislation. In this Court's opinion, the imposition of a criminal

sanction, for purely private and individual action, indicates that the previous general statement of principle and rights was sufficiently broad to include the right to be free from private as well as state interference.

It is of interest to note that Sections 3, 4 and 5 of the Act of 1870 have since been declared unconstitutional as in excess of the jurisdiction conferred upon Congress by the Fifteenth Amendment. This, to say the least, waters down considerably any presumption that Congress on this occasion was acting within the scope of its legislative authority. Any such presumption is further weakened by the principle that the Government of the United States, being a government of limited and enumerated powers, every valid act of Congress must find in the Constitution some warrant for its passage. United States v. Harris, 106 U.S. 629, 636, 1 S.Ct. 601, 27 L.Ed. 290.

In carefully scrutinizing this passage, in order to determine whether the right therein declared is limited to the right to be free from state discrimination, the Court is impressed with the reasoning of the dissenting opinion of Justices Burton, Black and Douglas, in the case of Collins v. Hardyman, 341 U.S. 651, 663, 664, 71 S.Ct. 937, 943, 95 L.Ed. 1253, wherein it was stated: "The language of the statute refutes the suggestion that action under color of state law is a necessary ingredient of the cause of action which it recognizes. R.S. § 1980(3) speaks of 'two or more persons in any State or Territory' conspiring. That cause is not limited to state officials. Still more obviously, where the section speaks of persons going 'in disguise on the highway * * * for the purpose of depriving * * * any person or class of persons of the equal protection of the laws,' it certainly does not limit its reference to actions of that kind by state officials. When Congress, at this period, did intend to limit comparable civil rights legislation to action under color of state law, it said so in unmistakable terms."

It is the opinion of this Court that this statement applies with equal force to subsections (a) and (c). In 1870, when (a) was first enacted, and in 1957 when (c) was enacted, Congress in other and similar legislation demonstrated its ability to limit such legislation to state officials by the use of clear and unequivocal language. The term "under color of law" was employed in subsection (b) of the Act of 1957. Other sections of the Act of 1870 employed the phrase "whenever, by or under the authority of the constitution or laws of any State * * *".

It is interesting to note, in this connection, that the complaint of the United States in this case defines the rights and privileges secured by subsection (a) of the statute in Paragraph One, in the following language: "the right and privilege of citizens of the United States who are otherwise qualified by law to vote at any election by the people in the State of Georgia to be entitled and allowed to vote at all such elections without distinction of race or color."

This statement of the right secured completely omits any reference to state constitutions, laws, usage, custom or regulations. The right is similarly defined in the majority report of the House Committee which recommended passage of the Act. House Report No. 291, U.S. Code Cong. and Admin.News, 85th Cong., 1st Sess., 1957, p. 1977.

The language of the subsection following the semicolon; to-wit: "any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding", was not intended to qualify and limit all that had gone before it in the section. To so hold would mean that even direct and positive state action of discrimination in voting rights on account of color could not be reached under this statute, unless the state action was based on some constitutional provision, law, custom, usage or regulation. Clearly, this was not intended when the section was re-enacted by Congress in 1957. This point is supported by the testimony

of Attorney General Brownell during the House Hearings on the Civil Rights Act of 1957, wherein he stated:

"For example, if you have a registrar of voters who arbitrarily strikes off several thousand names of Negro voters shortly before the deadline for qualification of voters and gives no hearing to them or an inadequate hearing, then I would think that would be a case that would alert the Attorney General under this bill to the need for some injunctive action, which would give those people their day in court and allow them, like any other citizen, the right of franchise." Hearings of Subcommittee of House on the Civil Rights Act of 1957, Serial No. 1, p. 601.

Clearly, it could not be argued that such conduct by one registrar in contravention of state law was based on any constitutional provision, statute, usage, custom or regulation. An isolated example could hardly be termed a state custom or usage. Congress did not intend to so limit the application of this section. If it was not an absolute limitation as written, it could hardly be re-worded by the courts to limit the section to a deprivation of voting rights by state officials only.

It may be argued, and has been, that the reliance on this section over the years proves its constitutionality. In viewing this contention, it must be remembered that this section was in no wise remedial. It was relied upon only in cases brought under remedial statutes, which included the term "under color of statute, ordinance, regulation, custom, or usage, of any State or Territory", and other similar language. When the two sections were construed together, they clearly did not provide any remedy against private, individual action. Thus, there was no reason for any attack on subsection (a). Now, however, Congress seeks to tie together two sections, neither of which is limited to state action or action by state authority. This it cannot do. When linked with a remedial statute properly limited, subsection (a) is harmless. But, when linked, as here, with a remedial section which uses the phrase "any person", it renders the remedial section beyond the jurisdiction of Congress and unconstitutional.

 Subsection (c) creates a remedy against purely private, as distinguished from state, deprivation of voting rights on account of race or color. The fact that the instant case is a suit against state officials cannot alter the scope of the statute. This illustrates the danger of this type of legislation, which danger was recognized as early as the case of United States v. Reese, 92 U.S. 214, 23 L.Ed. 563. There the Court held: "We are, therefore, directly called upon to decide whether a penal statute enacted by Congress, with its limited powers, which is in general language broad enough to cover wrongful acts, without as well as within the constitutional jurisdiction, can be limited by judicial construction, so as to make it operate only on that which Congress may rightfully prohibit and punish. For this purpose, we must take these sections of the statute as they are. We are not able to reject a part which is unconstitutional and retain the remainder, because it is not possible to separate that which is unconstitutional, if there be any such, from that which is not. The proposed effect is not to be attained by striking out or disregarding words that are in the section, but by inserting those that are not now there." It is true that there the Court was dealing with a penal statute. Here we are dealing with a statute authorizing an injunction, violation of which may carry its own penalty. The same principle would seem applicable.[1]

---

1. During the Subcommittee hearings on the Civil Rights Act of 1957, Senator Ervin made the following remark: "* * * if Congress has no power to provide any criminal penalties for those acts under the Constitution because it has no right to legislate in that particular area, it certainly would have no right to enact a civil law."

To which Mr. Brownell replied: "That is correct, and we are not asking for it." The difference between the type of remedy provided would not seem to alter the right of Congress to legislate with

When a person is enjoined from violating a statute, he is entitled to know what that statute proscribes, without awaiting the finality of an authoritative court opinion.

 As stated in the Reese case, supra: "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."

That this is exactly what this section seeks to do is demonstrated by the testimony of Attorney General Brownell in the Senate Hearings before the Subcommittee on Constitutional Rights while considering the Civil Rights Act of 1957. On Page 25 of those Hearings, Mr. Brownell testified: "These sections 4 and 5" (subsections (c) and (d) of the law as enacted) "are added here as machinery to enforce whatever the constitutional authority of the Federal Government may be in this area, and does not add to the substantive provisions of the statute."

Again, at page 51, he testified: " * * our guiding principle will be that only those statutes, parts of statutes that are constitutional, would be enforced by us, and we would not act in any way contrary to a Supreme Court opinion which holds that a statute or any part thereof that is unconstitutional." This indicates that the statute as written is sufficiently broad to include unconstitutional matter, but that the Attorney General expressed his intention of administering it in such a way as to seek no unconstitutional relief. While this is a noteworthy sentiment, the tenure of the Attorney General being what it is, the Courts can hardly rely on his intentions as to the administration of an act which in itself would support the grant of unconstitutional relief, if requested.

The Court has explored this question with particularity, because it is not un-

mindful in the least of the seriousness of the problem. This Court has never and shall never condone wrongful deprivation of the constitutional rights of any person by a state official or a private citizen. On the other hand, this Court is also sensitive to the dual sovereignty system of government under which we operate and is sincerely devoted to its preservation.

 It is this Court's considered opinion that this statute would allow the Attorney General to seek an injunction against a private citizen for an individual act, divorced completely from state action. It is the province of the several states to protect the rights of one citizen against the wrongful practices of another person. James v. Bowman, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979. Congress should not be allowed to extend the authority of the Federal Government into this field This it has tried to do. The Court is of the opinion that, if Congress intended only to authorize the Attorney General to enjoin or seek preventive relief against wrongful state action, it could easily have been accomplished, without resort to such confused legislation. Similarly, if Congress wishes to leave the courts some latitude in determining what may and what may not be enjoined, this may be accomplished by tying the remedy directly to the Fifteenth Amendment, rather than to another section, the constitutionality of which is far from clear.

For the reasons set forth above, the Court concludes that Section 1971(c) of Title 42 is beyond the jurisdiction of Congress and unconstitutional. It is not appropriate legislation within the meaning of Section 2 of the Fifteenth Amendment to the Constitution of the United States. There existing no other basis for an action by the Attorney General in the name of the United States seeking the remedy here sought, the motion to dismiss should be, and the same is hereby, granted.

reference to it. Hearings before the Subcommittee on Constitutional Rights of the Committee on the Judiciary,

United States Senate, February 14, 1957, p. 25.