Kenneth CONRAD; Alice Lisman, on behalf of the Estate of Gladys Vail; Olga Belote, on behalf of the Estate of Harold Belote; and all others similarly situated, Plaintiffs,

v.

Cesar PERALES, individually and as State Commissioner of the New York State Department of Social Services; New York Association of Homes and Services for the Aging, Inc.; New York State Health Facilities Association, Inc.; and Hospital Association of New York State, Inc., Defendants.

No. CIV–91–846C.

United States District Court, W.D. New York.

April 6, 1993.

Legal Services for the Elderly, Disabled or Disadvantaged of Western New York, Inc. (Anthony Szczygiel, of counsel), Buffalo, NY, for plaintiffs.

Sherrin & Glasel (Jeffrey J. Sherrin, of counsel), Albany, NY, for defendants.

## BACKGROUND

CURTIN, District Judge.

The primary issue in this motion to dismiss is whether trade associations invited by the State to help formulate a policy can be liable for civil rights violations if the policy deprives persons of their constitutional rights and benefits the clients of the associations. Plaintiffs Kenneth Conrad, et. al., are or are acting on behalf of Medicare patients at skilled nursing facilities in New York State who qualified for supplemental Medicaid benefits in 1989. They bring this action under 42 U.S.C. §§ 1983 and 1985(3) against the New York State Department of Social Services and three associations representing the nursing home industry in New York State: the New York Association of Homes and Services for the Aging, Inc.; the New York State Health Facilities Association, Inc.; and the Hospital Association of New York State, Inc. ("the Associations") for conspiracy to deprive plaintiffs of money under the Medicare Catastrophic Coverage Act of 1988 ("MCCA"), P.L. 100–360, codified at 42 U.S.C. § 1395c et seq. Plaintiffs also bring claims under New York Public Health Law § 2805–f(4) for illegal collection of funds and under State common law for fraud.

Defendant Associations filed a Fed. R.Civ.P. 12(b)(1) motion seeking to dismiss all claims against them.

## FACTS

Plaintiffs are, and seek to represent as a class,[1] Medicare patients in skilled nursing facilities in New York State who qualified for supplemental Medicaid coverage in 1989. In New York, supplemental coverage is paid through the State Medical Assistance Program ("MA"), a combination of Federal Medicaid, State funding through the Department of Social Services ("DSS"), and local funds. Unlike Medicare, Medicaid requires skilled nursing facility patients to contribute most of their monthly income toward the cost of their care. This dispute centers on the retention of plaintiffs' net available monthly contribution ("NAMI") by the nursing facilities.

In 1976, New York State instituted a Medicare optimization program ("MOP I"). L.1976, ch. 76; Social Services Law § 366(2)(b). The intent of this program was to encourage nursing homes to exhaust possible Federal Medicare coverage for their patients before seeking Medicaid reimbursement. The Federal government pays 100 percent of Medicare, while Medicaid involves a 40 percent State contribution for nursing home services. Thus, for patients eligible for both Medicare and Medicaid, it was in the State's interest to have the patients' nursing home service paid to the greatest extent possible by Medicare.

In 1984, the State attempted to modify MOP I by sending a letter to all nursing home administrators warning that failure to comply fully with MOP I procedures would subject the facility to sanctions. Responding to heavy protests from nursing facilities, the State established a Medicare Maximization Task Force in 1985 to explore better ways of increasing Medicare coverage of nursing home care for qualified patients.

As a result of the efforts of this Task Force, the DSS adopted MOP II in January 1987. MOP II was voluntary and designed to address the problems nursing facilities faced in attempting to maximize Medicare coverage. Because the facilities encountered long delays in Medicare reimbursement, those which elected to participate in the MOP II plan were permitted to bill both Medicare and Medicaid for each qualifying patient, keep the higher payment, and return the lower payment to DSS.

The dispute between the parties in this case centers on the distribution of the patients' NAMIs, or net available monthly income. The NAMI is the monthly payment an MA recipient is required to contribute to

1. A class certification motion is pending in this    action.

his or her health care costs. Limited deductions from gross income are allowed in determining NAMI. They are a personal needs allowance, certain support for the MA recipient's spouse, a family member allowance, and certain health care costs. *See* 18 NYCRR Part 360.

If Medicare coverage is available, a patient is not responsible for this contribution. However, when Medicaid is billed, the NAMI is automatically deducted. Pursuant to MOP II, when the facilities billed Medicaid and Medicare simultaneously for the same service, they also required the plaintiffs to pay their NAMIs. The NAMIs were retained even when the ultimate reimbursement came from Medicare and the Medicaid payment was reimbursed to DSS.

MOP II made little difference to nursing home patients in 1987 and 1988 because Medicare only covered their care in very limited circumstances. However, in 1988, Congress passed the Medicare Catastrophic Coverage Act (MCCA), expanding the availability of Medicare coverage for skilled nursing facility patients. In January 1989, nursing facilities began simultaneous billing for thousands of its patients, retaining the NAMIs for all of them, whether the reimbursement ultimately came from Medicare or through the MA. This policy continued until the end of 1989, when Congress repealed MCCA.

Plaintiffs claim that retention of their NAMIs when their bills were paid by Medicare under MCCA violated Federal and State law and their constitutional right to equal protection. They also claim that the Associations either conspired with the State or formed a joint state-industry plan which they promulgated as state actors to deprive plaintiffs. They seek both compensatory and punitive damages.

Defendant Associations concede that they participated in discussions with a New York State Task Force to formulate a plan to optimize Medicare coverage of nursing home patients but that the State alone, through DSS, was responsible for adopting and implementing MOP II. The Associations agreed to advise the State, but were never in a position to force either the State or their own member nursing facilities to implement or follow policy. The Associations further argue that as trade associations representing the interests of various types of nursing care facilities, they never collected Medicare, Medicaid, or private payment from any nursing home patient, nor do they provide any services for patients. Therefore, they did not deprive plaintiffs, nor anyone in the proposed plaintiff class, of any monies.

## DISCUSSION

In reviewing a motion to dismiss on the pleadings, "the factual allegations in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff." *Frazier v. Coughlin,* 850 F.2d 129, 129 (2d Cir.1988). The court should grant such a motion only if, after viewing plaintiff's allegations in this favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 123 (2d Cir.1991), citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

■ Plaintiffs first urge that this motion be converted into a motion for summary judgment because all parties have submitted affidavits supplementing the factual allegations set forth in the complaint. In a summary judgment motion, affidavits and other documents may be taken into consideration by the court. If there is no genuine issue of fact, summary judgment will be granted to the party entitled to prevail as a matter of law. Fed.R.Civ.P. 56. As in a motion to dismiss, all inferences are drawn against the moving party.

■ The factual matter in the affidavits submitted to the court to date have served primarily to define and explain MOP II within the context of a complex medical cost reimbursement system. The evidence presented was not needed to determine whether the allegations in the complaint were sufficient to survive a motion to dismiss as a matter of law. Thus, the Association's motion to dismiss will remain and be treated as such.

## I. SECTION 1985(3) CLAIMS

### A. Statute of Limitations

Defendants first argue that the § 1985(3) claim should be dismissed because the statute of limitations has expired. There is no separate federal statute of limitations for actions brought under § 1985. Rather, the court must apply the most analogous state statute. The Supreme Court has affirmed the Second Circuit's decision that the three-year statute of limitations of C.P.L.R. § 214(5) applies to § 1983 suits. *Owens v. Okure*, 488 U.S. 235, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). This court has previously ruled that § 214(5) applies to § 1985 claims as well (*Smith v. State Univ. of New York at Buffalo*, No. 88–CV–905 (W.D.N.Y. Sept. 9, 1992)), as have other district courts. *Gibbs v. N.Y.C. Police Dept.*, No. 88 CV 3638, 1992 WL 302910 (E.D.N.Y. Oct. 2, 1992); *Younger v. Cloonan*, No. 90 CV 3409, 1992 WL 35881 (S.D.N.Y. Feb. 20, 1992).

The more difficult question is determining when the statute of limitations accrues. The Associations claim the statute begins to run on the day of the conspiratorial overt act. By their calculations, any alleged overt acts pursuant to a conspiracy to develop MOP II would have ended prior to January 1, 1987, when MOP II was implemented. Item 11 at 9. The complaint only alleged that the nursing home industry representatives met with state officials in 1986. There was no claim of any meetings over the development of MOP II or the retention of NAMIs in 1989 or at any time within three years of the commencement of this action. The Associations assert that the passage of MCCA in 1988 made the retention of NAMIs more financially significant, but did not create a separate conspiracy and overt act from which to toll the statute of limitations. *Id.*

■ Plaintiffs counter that accrual occurs at the time which the plaintiff becomes aware that he or she is suffering from a wrong for which damages may be recovered in a civil action. It is the wrongful act, not the existence of the conspiracy, that triggers an actionable claim. "Where no single act is sufficiently decisive to enable a person to realize that he has suffered a compensable injury, the cause of action may not accrue until the wrong becomes apparent." *Singleton v. New York*, 632 F.2d 185, 192–93 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). *See also Keating v. Carey*, 706 F.2d 377, 382 (2d Cir.1983). (Plaintiff's cause of action arises when he knows or has reason to know of his injury.) In this case, plaintiffs' monetary deprivation did not occur until MCCA took effect in 1989. They could not have known that they might suffer injury before that time. This case was filed in 1991, within the three-year statute of limitations. It is not time-barred.

### B. Class–Based Invidious Discrimination Requirement

■ The Associations next contend that plaintiffs' claim must fail as a matter of law because they are not members of a protected class within the meaning of § 1985(3) and their complaint has not alleged any class-based, discriminatory animus on the defendants' part. A conspiracy to deprive persons of equal protection of the laws violates § 1985(3) only when it is motivated by a discriminatory animus against a protected class. *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971). They argue that the proposed plaintiff class, consisting of poor, mainly elderly, nursing home patients, cannot be categorized as members of a protected class within the meaning of § 1985(3).

■ Plaintiffs make a somewhat novel argument that a showing of class-based animus is only necessary for § 1985(3) violations when a private conspiracy is alleged. In 1971, the *Griffin* Court interpreted § 1985(3) to include private conspiracies which had "some racial, or perhaps otherwise class-based, invidiously discriminatory animus" behind the conspirators' action. This holding overruled *Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), which found the presence of state action necessary for liability under the statute. Plaintiffs argue that the converse premise of *Collins*, that state action in any conspiracy to deprive someone of rights protected under § 1985(3) satisfies the statutory prerequisite, was not overruled by *Griffin*. They rely on *Selzer v.*

*Berkowitz,* 459 F.Supp. 347 (E.D.N.Y.1978), to support this interpretation.

In *Selzer,* the court found the plaintiff had alleged a class-based discriminatory animus sufficient to survive a motion to dismiss. However, its decision also provided an alternative reason to justify denial. The court gave a detailed analysis of *Griffin* and concluded in a footnote that:

[G]iven a conspiracy involving state action, fulfillment of the *Griffin* prerequisite of a class-based invidiously discriminatory animus is not required; the conspired deprivation of "equal protection of the laws" or "equal privileges and immunities under the law" arising by virtue of the presence of state action.

*Id.* at 352 n. 4. Plaintiffs now urge that this court adopt the *Selzer* interpretation and permit their complaint to stand absent allegations of class-based discriminatory animus.

Without specifically overruling *Selzer,* the Second Circuit has continued to require an allegation of discriminatory animus by conspirators under § 1985 even when the conspiracy involves a government actor. *See Katz v. Klehammer,* 902 F.2d 204 (2d Cir. 1990); *Keating,* 706 F.2d at 386–88. Several district courts within the circuit have explicitly declined to follow *Selzer*'s lead (*Smith v. Walsh,* 519 F.Supp. 853, 856 n. 4 (D.Conn. 1981); *Singer v. Bell,* 613 F.Supp. 198, 201 n. 4 (S.D.N.Y.1985)), as has the Seventh Circuit. *Munson v. Friske,* 754 F.2d 683 (1985). (Nothing in the language of *Griffin* indicates that the animus requirement is limited to private conspiracies.)

Most recently, the Supreme Court reaffirmed the *Griffin* requirement. *Bray v. Alexandria Women's Health Clinic,* — U.S. ——, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). The opinion quotes with approval *Griffin*'s inclusion of this animus to prevent the statute from becoming a general federal tort statute. In light of this authority, this court declines to find a state action exception to the *Griffin* standard.

Plaintiffs have failed to allege any class-based, invidiously discriminatory animus by the Associations. Moreover, neither the plaintiffs as individuals nor the class they seek to represent fall within the protected class status necessary for a § 1985(3) claim. Absent these allegations, plaintiffs' § 1985(3) claim against these defendants must be dismissed pursuant to Fed.R.Civ.P. 12(b)(1).

## II. SECTION 1983 CLAIMS

In their Fifth and Eleventh Claims For Relief, plaintiffs allege that the Associations conspired with the State to formulate and implement MOP II in violation of the Fourteenth Amendment equal protection clause and the Supremacy Clause of the Constitution. They request relief under 42 U.S.C. § 1983.

Section 1983 provides a cause of action against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...."

■ While most defendants in § 1983 actions are state entities or government employees, private persons can be held liable under this section of the Civil Rights Statute if their actions can be fairly attributable to the State. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982). This requirement is satisfied if two conditions are met. First, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible. Second, the private party must have acted together with or obtained significant aid from state officials or engaged in conduct otherwise chargeable to the State." *Wyatt v. Cole,* — U.S. ——, ——, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992) (citations omitted).

The Associations argue that the activities they engaged in pursuant to the establishment of MOP II cannot be construed as state action. They were invited by the State to participate in a task force to determine methods of encouraging nursing homes to obtain as much Federal funding for their patient costs as possible. The responsibility for im-

plementing the plan remained with the State. If this is considered state action, they argue, every type of citizen participation on committees would become state action (Oral Argument, September 5, 1992).

Plaintiffs counter that the partnership aspect of a joint industry-state program makes implementation of the plan a state action and the industry representatives state actors, insofar as they aided in its formulation and promotion. The State's alleged failure to follow the required procedure under the Administrative Procedure Act in passing new regulations, combined with the State's name of "State–Industry Joint Plan," furnish evidence of state action on the part of the Associations. It implicates the Associations in a conspiratorial state action, not only to formulate policy but also to force its implementation for their own illegal gains. Item 22, ¶ 5; Oral Argument.

■ The court is not persuaded by plaintiffs' argument. Participation by defendants in a Task Force to advise and aid formulation of a plan to encourage nursing care facilities to optimize Medicare coverage of their patients does not amount to state action. The Associations have no authority or responsibility to promulgate new regulations or implement DSS policy. Private citizens and organizations play a vital role in participating on panels and committees to offer expertise and public input into governmental decisionmaking. If this activity were deemed state action, the possibility would arise that private citizens would be liable under the Civil Rights Act if the policy they recommend resulted in a Federal constitutional or statutory deprivation. This would cause a sharp curtailment of public participation.

Plaintiffs assert that public policy reasons for conferring immunity under § 1983 were considered and rejected recently by the Supreme Court in *Wyatt v. Cole,* —— U.S. ——, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). Item 22, ¶ 25. However, their reliance is misplaced. In *Wyatt,* the Supreme Court declined to use grounds of public policy to extend the affirmative defense of qualified immunity under § 1983 to private defendants who were clearly acting under color of state law. —— U.S. at ——, 112 S.Ct. at 1833. In this case, the court is accepting a defendant's public policy argument to refuse to expand the liability of private parties under the statute into an uncharted realm.

The court finds that the participation of the Associations in developing MOP II alleged by plaintiffs, without more, cannot constitute state action within the meaning of § 1983. Therefore, all § 1983 claims against these defendants are dismissed.

## III. STATE LAW CLAIMS

■ The Associations also seek to dismiss the related state law claims against them. The Tenth and Twelfth Claims assert that the Associations violated § 2805–f(4) of the New York Public Health Law (McKinney 1989), which imposes penalties for illegally charging nursing home patients for services, or for illegally soliciting or receiving payments either as a pre-condition for admission or a condition for staying in a nursing facility. Because the Associations do not operate any facilities, and do not charge or receive payments for services rendered to nursing home patients, these claims against them are dismissed.

■ The Sixteenth Claim for Relief alleges that the Associations and the State established a common scheme or plan for the purpose of fraudulently depriving plaintiffs of money. Although entitled "Fraudulent Taking of Funds," this claim does not actually allege that the Associations committed fraud, but only that they conspired with the State to defraud the plaintiffs. Under New York State law, "it is well settled that a mere conspiracy to commit a [tort] is never itself a cause of action." *Jan Sparka Travel, Inc. v. Hamza,* 182 A.D.2d 1067, 587 N.Y.S.2d 958, 960 (A.D. 4th Dept.1992). Since no claim alleges that the Associations perpetrated fraud, plaintiffs have failed to state a cause of action against these defendants. This claim too must be dismissed.

## CONCLUSION

Defendant Associations' motion to dismiss all the claims against them in this action is granted.

So ordered.